1   DAVID L. ANDERSEN (S.B. NO. 50010)
    ANDERSEN & ZIMMER
2   385 GRAND AVENUE, SUITE 300
    OAKLAND, CA 94610
3   (510)835-4952 FAX (510)835-4958

4   ATTORNEY FOR JUSTIN WHIPPLE

5                    **UNITED STATES DISTRICT COURT**
                     **NORTHERN DISTRICT OF CALIFORNIA**
6                      **SAN FRANCISCO DIVISION**

7   _____ )
                                          )
8                                         )   Action No.    CR 12-0119 SI
                                          )
    UNITED STATES,                        )   Date:         June 6, 2014
9                                         )   Time:         11:00 a.m.
                      Plaintiff,          )   Place:        Honorable Susan Illston
10                                        )
          v.                              )   Attached Documents:
11                                        )
    JOSEPH ORTIZ, et al.                  )   Exhibits 1 - 8
12                                        )
                      Defendant(s).       )
13  _____ )

14

15

16          **DEFENDANT JUSTIN WHIPPLE'S SENTENCING MEMORANDUM AND**
            **OBJECTIONS TO FINAL PRESENTENCE INVESTIGATION REPORT**

17

18

19

20

21

22

23

24

25

26

27

28

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - i -

# TABLE OF CONTENTS

I.      INTRODUCTION: ...................................................................................................... 1

II.     OBJECTIONS TO THE FINAL PSR: ..................................................................... 1

    A.      The Nuestra Familia: ....................................................................................... 1

    B.      Proposed Supervised Release Condition No. 5: ........................................... 4

III.    A SENTENCE OF FOURTEEN YEARS IS SUFFICIENT, BUT NOT
        GREATER THAN NECESSARY: ........................................................................... 5

    A.      The Sentencing Factors: ................................................................................. 5

    B.      The Offense: ..................................................................................................... 5

    C.      Justin Whipple's Background: ....................................................................... 7

        1.      Family Background: ............................................................................. 7

    D.      Justin's Education: ......................................................................................... 13

    E.      Potential for Rehabilitation: ........................................................................ 13

    F.      Character Letters: .......................................................................................... 14

IV.     CONCLUSION: ........................................................................................................ 15

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI            - ii -

1

## TABLE OF AUTHORITIES

2

### CASES

3    *Gall v. United States* (2007) 552 U.S. 38 ....................................................................... 5

4    *Kimbrough v. United States* (2007) 552 U.S. 85 ........................................................... 5

5    *United States v. Booker* (2005) 543 U.S. 220 ................................................................ 5

6    *United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008) ............................................ 5

7    *United States v. Lomayaoma*, 86 F.3d 142, 146 (9th Cir. 1996) ................................... 4

8    *United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir. 1994) .......................................... 4

9    *United States v. Napulou*, 593 F.3d 1041 (9th Cir. 2010) ............................................ 4

10

### STATUTES

11   18 U.S.C. § 3553............................................................................................................ 1, 5

12   18 U.S.C. § 3583(d) ......................................................................................................... 4

13   18 U.S.C. § 3583(e)(3)..................................................................................................... 4

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANDERSEN & ZIMMER**
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI                    - iii -

## I.    INTRODUCTION:

Mr. Whipple entered his plea of guilty pursuant to an agreement under Rule 11(c)(1)(A) and 11(c)(1)(B) of the Rules of Criminal Procedure. The agreement permits the Government to seek a sentence of no more than 192 months (sixteen years), and Mr. Whipple to seek a sentence of no less than 168 months (fourteen years). Probation is recommending the high end of that range.

However, Mr. Whipple requests that this Court recognize that fourteen years is a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. § 3553. A number of compelling factors support that conclusion. Among them are the defendant's role in the offense, his absence of prior record, and his truly chaotic upbringing. But in addition, it must be recognized that this offense was committed when Mr. Whipple was only eighteen years old. A sentence of "only" fourteen years, means that he will serve a sentence greater than three quarters of his lifetime at the time of the offense. A sentence greater than three quarters of the time he had been alive is an extraordinarily long sentence for one so young.

## II.   OBJECTIONS TO THE FINAL PSR:

Mr. Whipple has two objections to the PSR. The first is to the inclusion of material regarding prison gangs, which is contained in paragraphs 51 through 56 of the PSR. The second objection is to the fifth recommended condition of supervised release.

### A.    The Nuestra Familia:

Paragraphs 51 through 56 of the PSR, entitled "Overview of the Nuestra Familia," contains a history of two prison gangs, the Nuestra Familia and the Mexican Mafia. This history is not only irrelevant to the sentencing decision before the Court, but drawing a link to these gangs could prove prejudicial to Mr. Whipple as he serves the long sentence before him. Mr. Whipple has acknowledged being a member of the C Street gang. However, there are an infinite number of levels of gang involvement, and Mr. Whipple's involvement falls way short of the Nuestra Familia.

For reasons that will be more fully discussed below, Justin spent a great deal of his time as a teenager out of his home. Justin and a number of neighborhood kids did not have a place to

**ANDERSEN & ZIMMER**
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 1 -

go after school. However they wanted to be off the street. Justin wanted off the street, in part, because it prevented the police from detaining him. Justin felt that he was being profiled by law enforcement due to his race (African American/Caucasian), and that belief was not unreasonable. According to a San Mateo County Sheriff's Department report, Justin had been detained by law enforcement thirty six times as a juvenile. Despite the large number of detentions, Justin has virtually no record of arrests or convictions, and only one criminal charge, which was dismissed. Being detained and searched is humiliating, even if the detentions do not uncover criminal activity and the detainee is allowed to leave. It made Justin feel that he was unfairly being singled out by law enforcement.

As a result, Justin, and others, looked for a place where they could gather away from the police, and also from gang members in the neighborhood. That place turned out to be the garage of Andrew Bryant's mother. Andrew Bryant is a co-defendant in this case, and alleged to be a 500 Block Gang member. However, Mrs. Bryant lived on C Street, only a couple of blocks from the high school Justin attended. She has confirmed that her garage was open to anyone who wanted to hang out there. However, this was not an ideal situation. The Bryant home was so filthy that even the kids were uncomfortable going inside. The health department eventually condemned it, and it has been torn down. Despite this, it was in the garage and at the high school that Justin formed his relationship with many of his co-defendants.

In one sense it was inevitable that Justin would fall into relationships with people who were gang members, or would be seen a gang members. The neighborhood was an active gang area. The kids in the garage were from C Street, meaning the street, not the gang. However, there was a C Street Gang. The older members of the C Street Gang were not often around, as they were regularly in custody. However, some 500 Block members, for example Joey Ortiz, would occasionally show up at the garage due to their relationship with Andrew Bryant. That left a mixed group in the garage. Some were real gang members, but others were younger boys who hung out there. Many of these were not gang members in the sense that we are accustomed to thinking of gang members. This was confirmed by a Government cooperator in her taped statement to the police. She considered herself to be a real gang banger, but described Justin's

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI            - 2 -

crowd as lightweights, and not bangers. Justin was a young kid who was there in large part because his mother was at work and he did not want to be at home with his step father.

However, being seen as part of a gang was attractive in a shortsighted way. Being alone on the street in gang territory is dangerous. Being seen as part of a gang means that others will not readily mess with you. It is protection. As a result, Justin did not discourage others from seeing him as a member of C Street, and he associated with members, even though he had never been jumped into the gang, has no gang tattoos, and had never been called upon to do "work" for the gang. As the Court is aware, Justin's phone lines and that of his co-defendants were tapped. On Justin's line there were no conversations regarding Justin owning or attempting to acquire guns or bullet proof vests. There was no talk of robberies, or other violent crimes. He was never asked to back up gang members. He was also not dealing drugs, although there were conversations when he attempted to find MJ for his own use, usually without success. Finally, when his home was searched at the time of his arrest there were no weapons or gang emblems found. The officers did seize four baseball caps, but according to Justin's mother, these caps were four among many that Justin owned.

The probation officer noted that Justin is alleged to have a gang moniker of "Teddy." (PSR at 24.) However, "Teddy" is not a gang moniker. According to his mother, the family and others have called Justin "Teddy" since grammar school. Teddy is actually short for "Teddy Bear," which was the nickname given to Justin by the girls in his third grade class.

In sum, Justin's gang involvement was minimal, and there is no indication that he ever received orders from, communicated with, or had any other contact with, the Nuestra Familia or the Mexican Mafia. Including references to these very serious criminal organizations does not aid the court in choosing between the sentencing alternatives. This history does not bear on Justin's offense, his background, or his character. However, it may mislead BOP staff, and prejudice Mr. Whipple's classification once he is received by the BOP. Accordingly, the Court should order that paragraphs 51 through 56 be deleted from the PSR prior to its delivery to the BOP.

///

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 3 -

**B.      Proposed Supervised Release Condition No. 5:**

The Final PSR recommends the following condition of supervised release:

> 5.      The defendant shall not associate with any member of the 500 Block/C Street gang. The defendant shall have no connection whatsoever with the Norteno Gang or any other gang. If he is found to be in the company of such individuals or wearing the clothing, colors, or insignia of the 500 Block/C Street Gang, or any other gang, the court will presume that the association was for the purpose of participating in gang activities.

PSR Addendum at pg. 4. Mr. Whipple does not object to a condition that prohibits association with <u>known</u> members of the 500 Block/C Street gang, or even other gangs. Such a condition would be reasonably related to the goals of deterrence, rehabilitation, and protection of the public. 18 U.S.C. § 3583(d), *United States v. Napulou*, 593 F.3d 1041 (9th Cir. 2010). However, the proposed condition goes beyond those goals for two reasons. First, it would base a violation on association with a member of a gang whose gang affiliation was not known to the defendant.

Second, the portion of the condition that establishes the presumption of a violation based on clothing or insignia is both vague, and goes beyond supervision to prejudging the defendant's conduct. A condition that he not wear "clothing, colors, or insignia of the 500 Block/C Street Gang, or any other gang" is vague since it is impossible to know what some gang someplace may adopt as its color or its insignia. What a gang might adopt as its insignia will also change over time. Accordingly, any condition that prohibits what is to be worn or displayed should set forth that which is prohibited so that the defendant will have notice. Second, stating that the court will presume at some future date that "association was for the purpose of participating in gang activities" improperly shifts the burden of proof at a violation hearing to the defendant. The court may revoke a defendant's supervised release only where a violation of a condition has been shown by a preponderance of the evidence. 18 U.S.C. § 3583(e)(3); *United States v. Meeks*, 25 F.3d 1117, 1123 (2d Cir. 1994)*; United States v. Lomayaoma*, 86 F.3d 142, 146 (9th Cir. 1996). A violation may not be based on a presumption.

Supervised release condition number five should be modified to only prohibit association with known gang members.

///

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 4 -

## III.    A SENTENCE OF FOURTEEN YEARS IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY:

### A.    The Sentencing Factors:

The Supreme Court held in *United States v. Booker* (2005) 543 U.S. 220, that the Sentencing Guidelines are advisory. This was clarified and reiterated in *Gall v. United States* (2007) 552 U.S. 38, and *Kimbrough v. United States* (2007) 552 U.S. 85. Accordingly, the Guidelines are but one of a number of factors to be considered under § 3553(a). Further, they are but one factor among equals, and are entitled to no greater weight than any other. *United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citations omitted) (holding that "while the Guidelines are to be respectfully considered, they are one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.")

Under 18 U.S.C. §3553, the Court is to impose a sentence that is "sufficient, but not greater than necessary" to serve the sentencing goals set forth in that section. Accordingly, the court must consider the guidelines, the circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentencing disparities, the need for restitution, and then impose a sentence:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In this case, a sentence of fourteen years is sufficient, but not greater than necessary to serve the goals of §3553.

### B.    The Offense:

The only criminal incident in which Justin is alleged to have participated is the shooting on December 22, 2010. Mr. Whipple is not attempting to minimize the gravity of his offense, and recognizes that these charges are serious enough. However, it is worth noting that he is not charged with the other robberies, shootings, or stabbings that were alleged against his

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI                - 5 -

1    codefendants.

2           On December 22, 2010, Justin was at home. He had been out late the night before with a

3    friend, and he had planned to stay in that day. However, he began getting calls from another

4    friend. These calls are reflected in the phone records in discovery. The friend was with Joey

5    Ortiz, and his friend wanted Justin to join them. The reason that there were a number of calls is

6    that Justin initially said no, but then he said yes after his friend continued to plead with him. His

7    reason for changing his mind is that Justin and his friend did not like Joey. Joey was very hard to

8    be with, and being stuck alone with Joey was going to be difficult for Justin's friend. Justin

9    agreed to meet them only because of his friendship. Justin's friends are very important to him, so

10   he answered his friend's call as a favor. On such decisions your whole life can turn.

11          Justin knew that Joey was odd, but on that day he did not realize just how unstable and

12   volatile Joey actually was. Justin knew Joey from the neighborhood and occasionally the

13   Bryant's garage, but they did not hang out together. Joey was older, and had been in custody for

14   most of the time from Justin's mid teen years until the offense. Justin did not even know that

15   Joey was responsible for the shooting that had occurred four days earlier on December 18, 2010.

16          What is most important about Justin's role in the December 22 homicides, is that he did

17   not intend to shoot or kill anyone. In fact, he did not shoot or kill anyone. Further; he had not

18   anticipated that what occurred would occur. Justin had turned eighteen only six months before

19   these homicides, and that is an age when teenage boys do not think things through. In retrospect

20   it may be easy to see how great the potential for violence was, especially with greater knowledge

21   of Joey's volatility than Justin had. But, Justin just did not see it coming.

22          Justin was stunned when Joey got out of the car and began shooting. At that point he had

23   a choice make. Follow Joey or not. Justin chose not. Joey Ortiz told a Government cooperator

24   that Justin did not shoot because he "chickened out." While it is true that Justin did not shoot, it

25   was not because he had chickened out, or because he was prevented from shooting. Justin did not

26   foresee that Joey would go on a rampage, and Justin wanted no part of it. It wasn't fear that

27   dictated his behavior. He chose not to participate because it was wrong, and, as the letters from

28   family and friends attached to this memo demonstrate, it would have been completely out of

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 6 -

1   character for Justin.

2   **C.    Justin Whipple's Background:**

3       1.    **Family Background:**

4       Justin's Whipple's upbringing has been marked by a large number of the risk factors

5   which the Department of Justice recognizes as causes of delinquent behavior. Nearly all of these

6   factors were not of Justin's own making, but they had a great impact on the course of his life.

7       Justin's mother is Kathy Mitchell, and her upbringing was also chaotic. Her relationship

8   with her father was poor due, in part, to the fact that he suffered from severe depression. His

9   condition became critical when he suffered two severe blows. First, Kathy's mother died of

10  ovarian cancer when Kathy was fifteen years old, and then they lost their home. Kathy's mother

11  had been the glue that held the family together. After her death, Kathy's father withdrew to the

12  extent that his business failed, and they eventually lost their home. Kathy moved out to get away

13  from her father as soon as she could. But she was just eighteen, and unable to support herself.

14  She was forced to move back.

15      She became pregnant with Justin shortly after. Justin's father, Brian Whipple, was just

16  eighteen. He came from a family situation that on its face was even more difficult than Kathy's.

17  Phyllis Whipple, Brian's mother, was married in Georgia when she was only fourteen years old.

18  Brian's father was a drug addict and had walked out on his family when Brian was only ten.

19  When her husband left, Phyllis fell seriously into drugs, and she got by while supporting her

20  habit in any way that she could. According to Kathy, Phyllis had about four AKAs, and was not

21  an honest person. When Brian was still a young boy, he began smoking crack cocaine with his

22  mother. By the time Kathy and Brian were together, Brian was a young traumatized black man

23  with an already severe crack addiction. It was so severe that when Kathy was in labor, Brian left

24  the hospital to buy drugs.

25      Kathy and Brian were married despite their youth and despite the fact that neither were

26  equipped to be parents. (Teenage parenthood is a recognized DOJ risk factor.) They moved in

27  with Brian's mother when Kathy was pregnant. Brian's mother lived in the Sunnydale Housing

28  Project. Justin was brought there from the hospital after being born on June 13, 1992. It was one

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI                - 7 -

of the worst living situations in the city, and they had to move. (Poor community conditions is also a recognized DOJ risk factor.)

This move was the first in what became an incredible number of moves for Justin and Kathy. Between his birth and May 2012, when Justin was arrested, Justin and Kathy moved sixteen (16) times for which there is documentation. In addition to these moves, there were periods when they were homeless, living in shelters, or temporarily living on the couches of friends or relatives.

The following table is a chronology of the moves, with dates as closely as the undersigned was able to determine them. The gaps in time were filled by temporary stays with friends, or with others at places they could not call their home. It also does not include at least one move while living in Oakland. This history is important because a history of repeated moves as a child is another Department of Justice risk factor.

| Date | Address |
| --- | --- |
| 1.  June 1992 to December 1993 | 1526 Sunnydale Avenue<br>San Francisco, CA |
| 2.  January 1993 to January 1994 | 433 Gonzalez Drive<br>San Francisco, CA |
| 3.  Solano County | This period followed the breakup with Brian. Kathy and Justin stayed with friends and in a Women's Shelter |
| 4.  November 1995 to August 1997 | 540 Capp St. Apt 105<br>San Francisco, CA<br>This was the period Kathy and Justin lived with Tiffany Innocencio who has provided a character letter. |
| 5.  August 1997 to March 1998 | 1124 Prague Street<br>San Francisco, CA |
| 6.  March 1998 | 40 Poncetta Dr<br>Daly City, CA |
| 7.  May 1998 to June 2001 | 5540 Edgerly Street<br>Oakland, CA |
| 8.  July 2001 | 433 Gonzalez Drive<br>San Francisco, CA |

ANDERSEN & ZIMMER<br>385 GRAND AVE. SUITE 300<br>OAKLAND, CA 94610<br>(510)835-4952

Def Whipple's Sentencing Memorandum<br>US v. Joseph Ortiz, et al. CR 12-0119 SI                    - 8 -

| Date | Address |
|------|---------|
| 9.   September  2001 to August 2002 | 254 Rio Verde Street<br>Daly City, CA |
| 10. August 2002 to February 2003 | 649 Villa Street<br>Daly City, CA |
| 11. February 2003 to October 2004 | 11 Lewis Avenue<br>South San Francisco, CA |
| 12. November 2004 to November 2005 | 1040 Grand Avenue, Apt 4<br>South San Francisco, CA |
| 13. November 2005 to December 2009 | 527 Baden Avenue, Apt 7<br>South San Francisco, CA |
| 14. January 2010 to December 2010 | 567 Commercial Ave, Apt 2<br>South San Francisco, CA |
| 15. January 2011 to December 2011 | 280 East Avenue<br>San Bruno, CA |
| 16. January 2012 to May 2012 | 1480 Crestwood Drive<br>San Bruno, CA |

When Justin was still quite young, Brian became physically abusive with Justin's mother. Kathy's older sister can remember seeing Kathy with black eyes. (Violence in the home is another recognized DOJ risk factor.) As a result, the marriage lasted only two to three years. The straw that broke the camel's back was an occasion when Brian stole money from Kathy's sister to feed his habit.

Brian paid little attention to Justin after he left. Justin's most vivid memories of his father are when he was not there. For Justin's early birthdays Kathy would contact Brian, Brian would promise to come, but he would not. Justin remembers waiting for his father, and then having to recognize that his father did not care enough. His other memory of his father is seeing him hanging out on Market Street playing board games. This apparently occurred when Justin and Kathy were living in a homeless shelter in San Francisco. Defense investigators actually found Brian Whipple about a year ago. Brian had had no contact with Justin for many years. When we found him, he was living in a shelter in San Francisco. Now Brian deeply regrets his treatment of Justin and Kathy. He recognizes that drugs had consumed his life. When interviewed, he said he was drug free, but he was still dealing with drug issues on a day to day basis.

Kathy and Justin moved so many times due to poverty. They were often evicted. They lived in a woman's shelter in Fairfield for a while. Her brother remembers visiting her there. She also applied for AFDC in Solano County. However, Kathy is a worker and often found work, thereby disqualifying her for aid, even though the income was small. For almost two years she and Jusin lived with another woman, Tiffany Innocencio, in San Francisco who was also a single mother. They lived together and sent their children to the same religious pre-school (the San Francisco Christian School) in order to share the rent and also to share childcare. With some family support Kathy began to get back on her feet, but then she met Chaka Pipkins. Mr. Pipkins turned out to be second poor choice of partners.

When Justin was about five, Chaka, Kathy, and Justin moved to Oakland because they believed that it would be cheaper to live there. Justin began school there, but Kathy believed the neighborhood in which they were living was too dangerous. East Oakland had a deserved reputation for drugs, prostitution and violence. Thirty two point seven percent (32.7%) of residents live below poverty level. Fifty percent (50%) of residents have less than a high school education. This was also during the crack epidemic in Oakland. Crack ran like a fire through many of the black neighborhoods. Real violence followed. (Community violence is another recognized risk factor.) Kathy became too afraid, and they moved back to the West Bay after three years.

It soon became apparent that Chaka was a sponge. Like Brian, he used drugs, was addicted to crack, was a severe alcoholic, and never maintained employment. As a part of the mitigation investigation into the family we checked on Chaka's prior cases, both criminal and civil. He was a defendant in four civil and twenty criminal cases in San Mateo County. He was a defendant in two criminal cases in San Francisco, and we believed he had other cases in Solano County. However, we dropped that avenue of investigation before we checked for those records. Some of these cases were for unpaid child support for his children by other women. The pattern of not contributing financially was a pattern that had been set before Chaka met Kathy. Chaka had done jail time as a result of some of his cases. He had also been arrested at Justin's home and in front of the family a number of times. One of the occasions was caught on Justin's phone

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI                    - 10 -

records in 2011. Justin texted a friend that he had come home to find a lot of cops arresting his stepfather. According to Justin, the silver lining was that his stepfather had left "hella weed" behind. There was marijuana use in the home, and Kathy acknowledges that they smoked it in front of Justin.

Justin was eighteen years old by 2011, and was able to make light of watching his stepfather being cuffed and taken away. However, regardless of a child's age, it is a traumatic experience when a father figure is hooked up and hauled away by the police. It would have been even more traumatic on the other occasions when Justin was much younger. Exposure to parental criminality, and paternal failure to financially contribute to a child - true of both Brian Whipple and Chaka Pipkins, are recognized Department of Justice risk factors.

Chaka and Kathy had one child together, which may be one of the reasons that Kathy tried for so long to make the relationship work. However, it never did, and it was punctuated by separations during which Chaka would plead to come back. Kathy would give in. (Divorce and marital discord are other DOJ recognized risk factors.) During the course of the relationship, Chaka was a consistent drain on the family resources. Kathy would complain about his not working and Chaka would get a job. However, he would immediately get fired or quit when his wages were garnished for back child support for his other children. He also set the family back financially by buying drugs, and by crashing their cars while driving under the influence. One time he crashed the car while trying to outrun the police who were trying to serve another warrant.

Kathy was the bread winner, but she had no special qualifications for high paying positions. The family lived close to, or in poverty at all times. (Poverty is another DOJ recognized risk factor.)

The pressure that comes from having no special job skills, but having to support a family, meant long hours and kept Kathy out of the home much more than she would have wanted. As a result, the child rearing fell to Chaka. He was at home because he did not work. However, Chaka was not the person you would want to raise your kids. Kathy's brother, David, went over to Kathy's house to pick up Justin one afternoon and found the boys on their own, with Chaka in a

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 11 -

stupor. He had passed out on the couch either drunk or drugged. Melvin, Justin's half brother, was about five at the time, and repeatedly told David, in a fearful tone of voice, "Don't wake my dad up, don't wake my dad up." Chaka didn't wake up, regardless of the amount of noise David made. David gathered the kids, the stuff they needed, and left without Chaka stirring at all. Inadequate or inappropriate child rearing practices is also a DOJ recognized risk factor.

For much of his youth, Justin tried to stay out of the house. He did not want to be there with Chaka, who was usually drunk. Justin's mother was at work, so he could not be with her. The result is that he was on the street. This is not a criticism of Kathy. She did the best that she could for her boys under very difficult circumstances. However, the reality is that she had to stay focused on providing the necessities. She could not be there for her children every time they needed her to be. It is ironic that only shortly before Justin's arrest did Kathy finally achieve a level of stability and financial security. Her relationship with Chaka has ended. She is single, and she now has a very responsible position with a stable employer.

Kathy is devoted to Justin, and he to her. They have a special bond which comes from having been through so much together. They have been the one constant in each other's lives. Justin is also extremely close with his younger brother Melvin, who is now a sophomore in high school. Melvin is an avid basketball player and skateboarder. He learned both from Justin, who gave Melvin his first basketball and his first skateboard. It was important to Justin that Melvin be able play these sports because sports were one of the things that got Justin out of the house when he was having a hard time with Chaka.

What has particularly struck the undersigned about Justin is that when he learns something new about trauma, brain impairment, or the DOJ risk factors, he always asks how he can communicate this new knowledge to his mother so she can help Melvin. He is very concerned that Melvin not go down the same path that he did. When he was told the purpose of a neuropsychological evaluation, he asked if the neuropsychologist could evaluate his brother instead. He would rather his brother benefit from the results.

Justin has had difficulty finding his place in the world. This is due to a number of things largely beyond his control. First, the large number of moves that his family made while he was

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 12 -

growing up made it difficult to put down roots. Complicating matters was that the family moved from one poverty stricken, gang ridden, housing situation to another. These are places where friendships are not easily forged outside of gang memberships. Second, Justin's mother is white and his father is black. Chaka Pipkin, his stepfather, is also black. That left Justin straddling the racial divide that becomes so pronounced once kids get to junior high and high school. Finally, when Justin was of junior high school age he began to put on a lot of weight. Being fat as he entered his teen age years also set him apart. The result of this is that when Justin did form a friendship, that friendship became very important to him. Hence his willingness to join his friend on the day of the offense.

### D.    Justin's Education:

Justin ended school at the high school level without having graduated. His last school was Baden Continuation School, which was also the school for some of his codefendants. Although he did not graduate from Baden, he did obtain a GED.

As the probation officer noted, Justin's school records show that he had a hard time in school. They contain a number of references to his inability to focus on the task at hand. With current knowledge he would probably have been evaluated for Attention Deficit Hyperactivity Disorder. But, given the schools he was attending, he was not evaluated. He simply struggled and then did poorly. (Poor academic performance is a recognized risk factor.) Justin is not stupid. He is quite bright, but despite his intelligence school was a severe negative experience for him. His younger half brother, Melvin, began to exhibit the same problems that Justin had suffered. However, Melvin was evaluated, was diagnosed with ADHD, did receive treatment, and has been doing better in school than did Justin. (ADHD is aother Risk Factor.)

### E.    Potential for Rehabilitation:

Justin was given a series of neuropsychological tests while in custody. The results showed that Justin is "normal." Normal in intelligence, and other aspects. His lack of academic achievement was noted, but that was not due to lack of intelligence. Justin was deeply depressed following the testing. He was certain that the testing would show that he was retarded, and that really bothered him. Justin has a very poor self image, and little self confidence. As a

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 13 -

consequence he has always had low expectations for himself.

That having been said, Justin began a turnaround of his life after the current offense. It was a wakeup call for him. Although he did not know the cause, Justin's uncle, David Mitchell, noticed the change. As he states in the letter which is attached to this memorandum, "we could see that something had changed. He got serious about getting a job, he stopped associating with certain people, he stayed home more and got a driver's license. He even had a nice girlfriend."

The job search was successful. Justin began working at Peet's Coffee in Menlo Park. He began in 2011. Being a barista may not be at the top of the job scale, but Justin worked very hard to get that job. He put in a lot of applications and went through a lot of interviews. His last performance review was "Justin is friendly and welcoming. Customers (and staff) love his addition to the team. He strives to serve the best quality product every time. He often offers several options to customers to ensure they are getting exactly what they want. I look forward to seeing his growth with the company." I have attached a number of character letters from his co-workers. They really did love him. One of the character letters is from a police officer of twenty five years experience.

Upon his release from custody, Justin will have one very important thing going for him. That is the support of his family. His mother is now in a position to give him the support which she was unable to give when he was young. While in custody he intends to take advantage of what training and education are available to him. He has a very low potential for recidivism, and a high potential to make a useful and productive life.

**F.      Character Letters:**

I have attached a number of character letters. They are exhibits 1 through 8. (The electronic version of this Memorandum is "Bookmarked" for ease of access to a particular letter.) They are:

Exhibit 1 - Letter from Kathleen Mitchell, Justin's mother

Exhibit 2 - Letter from David Mitchell, Justin's uncle.

Exhibit 3 - Letter from Gina Corea, Justin's aunt.

Exhibit 4 - Letter from Tiffany Inocenio

ANDERSEN & ZIMMER
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI                - 14 -

1    Exhibit 5 - Letter from Stefanie Nasir, Co-worker

2    Exhibit 6 - Letter from Jeffrey Vasquez, Co-worker

3    Exhibit 7 - Letter from Shannon Beggs, Work Supervisor

4    Exhibit 8 - Letter from Diana Becerra, Co-worker

5    The contrast between the person depicted in these letters and the offenses for which

6    Justin has been convicted could not be greater. The person these people knew is warm, caring,

7    and a wonderful person. The offense involves murder. In many cases there is no explanation for

8    the huge gap between the offense and the person depicted in character letters. However, in this

9    case there is an explanation. In this case Justin did not consciously get involved in the violence.

10   When it happened he did not yield to peer pressure to go along. Instead he refused. If Justin had

11   seen the violence coming, Justin would not have been in that car. Justin made poor choices, but

12   he did not choose to kill or to hurt anyone, and those who know him best know that to be true.

13   **IV.    CONCLUSION:**

14   If the Court chooses to accept the plea agreement, a sentence of between fourteen and

15   sixteen years will be imposed. As noted above, a sentence of fourteen years is an extraordinarily

16   long time when considered in relation to Mr. Whipple's youth. Further, none of the sentencing

17   goals of § 3553will be served by a sentence of sixteen, rather than fourteen years.

18   Fourteen years adequately reflects the seriousness of Mr. Whipple's role in this offense.

19   It will promote respect for the law and punish him severely for the choices he made. The addition

20   of two years to an already long sentence is unlikely to provide greater deterrence to others. A

21   sentence of fourteen years will also adequately protect the public. When Mr. Whipple is released,

22   he will be middle aged, more mature, and with a greater sense of judgment than he had at the age

23   of eighteen. Certainly in fourteen years Mr. Whipple will be able to exhaust the educational

24   opportunities available to him in the BOP.

25   Fourteen years is sufficient and not greater than necessary.

26   ///

27   ///

28   ///

**ANDERSEN & ZIMMER**
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952
Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI          - 15 -

1   DATED: May 30, 2012

2                                                          Respectfully Submitted,

3                                                  _____/s/ David L. Andersen_____
                                                          David L. Andersen
                                                   Attorney for JUSTIN WHIPPLE
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANDERSEN & ZIMMER**
385 GRAND AVE. SUITE 300
OAKLAND, CA 94610
(510)835-4952

Def Whipple's Sentencing Memorandum
US v. Joseph Ortiz, et al. CR 12-0119 SI            - 16 -

Exhibit 1

March 27, 2014

Senior District Judge Susan Illston
San Francisco Courthouse, Courtroom 10 - 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Illston,

My name is Kathleen Mitchell, for the last 10 years I have worked at the American Academy of
Ophthalmology as an Administrative Coordinator. In addition to my work experience however, I am a
mother and have been blessed with two healthy sons. I am Justin Whipple's mother.

Justin is my oldest son and I was 20 years old when I had him. Although I have never been married,
motherhood has come naturally to me. I fell in love with Justin the moment he was born. As a little boy
he was sweet, loving, affectionate, filled with questions all the time and had a great sense of humor. As
Justin grew older he did not lose any of these great qualities. Justin is the type of person you instantly like
when you meet him. He has good manners and has always been respectful of his elders.

Justin is also a great big brother to Melvin, his younger brother. With six years between them, Justin
would spend time with his brother even if he didn't have to. They talk about everything from sports, to
girls and video games. Justin is always ready to give Melvin advice and steer him in the right direction. A
month before he was arrested I went out of town for work for 4 days and Justin stepped up and took care
of his little brother. He took him to school in the morning, picked him up in the afternoon and he still
went to work at Pete's Coffee in Belmont. I knew I did not have to worry because Justin had become a
responsible person I could count on.

My family, Justin, Melvin and I are extremely close. We talk about everything; we laugh, wrestle, and
like most families, get on each other's nerves. I could not have asked or wished for better sons. As much
as I have done for them, they have enriched my life so much; I couldn't imagine a world without them.

I cherish the time before Justin was arrested when he would come into my room on a Saturday or Sunday
morning and crawl into bed next to me where we would talk or watch a movie. Usually Melvin would get
up and we would all crowd into my bed fighting for covers and laugh as they are trying to get me to make
them a big breakfast. I really miss those weekend mornings as does my youngest son, Melvin.

Don't get me wrong, Justin is not perfect. There were times I wanted to wring his neck with some of his
choices he has made. But I think with the things Justin has experienced in life he lost himself a little.
Justin's biological father was absent throughout most of Justin's life and his stepfather who is Melvin's
father, who I was with for 14 years was not the ideal male role model or life partner. Through the years
and to this day, I have been the bread winner, the mother, the father and the decision maker for my
family. I feel that I didn't nor was I always able to put Justin first. I understand now that at times he really
needed to be first and needed a more structured, stable home life. Like many single mothers, I will always
feel guilty. However, I also know that I have done the best I could with the resources available to me.

I have always shown my sons love and affection and tried to show them that morals and values are
important qualities to have as an individual. At times, I do think I failed to show him the skills to choose
friends that also have those qualities. One of the things I've always told Justin is that it doesn't matter if
you are not doing anything wrong but if you choose to hang out with people that are, you will be
considered the same type of person. I wish that was one piece of advice he actually heard and taken.

When the charges against him were brought up it was the biggest shock of my life. I thought that this was so out of character for him and I just couldn't believe it. Since then the last 2 years of our lives have been filled with questions, regret and heartbreak for everyone. When visiting Justin for the last 2 years and talking about life and the choices we make in life, I can see that he is utterly sorry for his part in a situation that has brought others grief and sorrow. I also think that by his refusal to pull the trigger that night is an indication of his character. Even though he was sitting in that car he knew he did not want to bring harm to anyone.

I believe with the support of his family, my son Justin Whipple will serve his time and come out and work hard to be an individual that will lead a productive and healthy life. That is why I ask you to have leniency when sentencing my son and please keep in mind that he does have a family that loves him and we are prepared to do anything to support and help him in his rehabilitation.

Thank you for your time and consideration.

Sincerely,

Ms. Kathleen Mitchell

Exhibit 2

March 17, 2014

Dear Judge Illston,

My name is David Mitchell and I'm Justin Whipple's uncle. His mother is my youngest sister. I'm an Operations Manager for a worldwide courier service for the past 19 years.

I'm writing this to ask for leniency in my nephew's sentence.

I'm sure you've read all the reports from Mr. Anderson's team about Justin's upbringing. I can't add anything that you haven't already read. I wish to maybe tell you something about Justin that you won't read in a report.

Justin is one of the nicest, kindest, brightest, easy going, funniest person you will ever meet. I have yet to run across a person who didn't like Justin. Whether it was a classmate, school teacher, personal family friends, neighbors or coworkers they all think Justin is a good guy. It's disturbing to the people that do know Justin that these charges have been brought against him. They all think it's totally out of character and don't believe what they are hearing.

So what went wrong? Why did he feel the need to associate with the type of people that he did? Why did he get in that car? Why did he not see that it was seriously wrong? Did he even know to what extent of what was going to happen? That will be a question that will haunt my family forever.

I will guarantee he will not make that mistake again. He changed after that night. Even though we had no idea he was involved in these crimes, we could see that something in him had changed. He got serious about getting a job, he stopped associating with certain people, he stayed home more and got a drivers license. He even had a nice girlfriend. I believe he did see his mistakes and worked on correcting them. He knew it was wrong and didn't want to be involved, he knew it that December night. That's why he didn't participate in the shooting. He didn't want to hurt anyone for any reason.

I'm again go to ask for leniency in my nephew's sentence. He has never been arrested before this. If he left jail today he would not ever be in any trouble again. He learned his lesson before ever getting arrested 2 years ago. He will be a productive citizen to society with lots to offer. I'm looking forward to the day this young man can put this very bad episode behind him and get on with life.

Thank You for taking the time to read this.

David Mitchell

Exhibit 3

March 18, 2014

Your Honor,

It is with much sorrow that I have to write this letter pleading mercy from this Honorable Court
for my nephew Justin Keith Whipple. My name is Gina Corea and I am a stay at home mom and
housewife. I want to help Justin in any way I can. The charges against him breaks our heart
everyday but I feel strongly about Justin, the person I know him to be and about his future. Our
entire family is dedicated to supporting Justin and the means necessary for his complete
rehabilitation.

Justin  is a person of good moral character, I realize that might seem hard to believe, given the
tragic circumstances, but it's true nonetheless. I have known Justin his whole life, Justin was
always such a wonderful, loving and smart child. He has brought a lot of joy, laughter and love
into our family. As a young man we have seen him go through ups and downs. Justin childhood
has not been easy.  His biological father had a crack addiction and has been absent most of
Justin's life, his stepfather a chronic alcoholic. Justin had had no real positive father figure to
guide and love him.  My sister faced a lot of hardship, with very little support and resources she
did her best in raising two boys by herself, working hard to support them and keeping a roof
over their head and food on the table.

I can honestly say I have never seen any violent tendencies in Justin. He does not have a
criminal record at any level.  He is not a repeat offender. He has never been in trouble with the
law until now.  As a big brother he has always displayed only love and desire to protect and care
for his little brother. As a cousin to my daughter he was patience, loving and playful. He as
shown only respect and love for his family, this is why I am convinced that he is a good and
decent person at the core.

I do recognize that Justin broke the law. Justin has made a terrible decision and is incredible
remorseful. I believe him admitting guilt to the 7 counts against him is only his first step to take
responsibility for his part in this tragic situation and the hurt he has cause to the victims and their
families. I just hope you will recognize the power you wield with regard to the future of this
young man. I believe he still has future to become the person I know he can be but to do that he
needs you to give him an opportunity to get a second chance. I can only hope for a fair decision
and I beg the courts for leniency when sentencing him. Thank you.

Regards,

Gina Corea

Exhibit 4

Inocencio, Tiffany

Subject:                    FW: Justin Whipple

**From:** Inocencio, Tiffany
**Sent:** Monday, March 24, 2014 1:43 PM
**To:** 'Kathleen Mitchell'
**Subject:** Justin Whipple

To Whom this may concern,

I am writing this letter in the hopes it will help in the leniency of your sentencing decision. I have known Justin Whipple his entire life. I have always called and treated Justin, my nephew. I met his mother Kathy, Freshman year of High School. Kathy, her family, and mine have remained close friends throughout the years.

Kathy is the God Mother to my oldest son Joseph, whom is twenty-three. I have 2 other children; my daughter Kaia, whom is thirteen, and Little Anthony. He will be 9 years old, next month. I am a daughter-in-law to a retired Police Officer. I am married to a Police Officer, and my brother-in-law is a Police Officer.

When Kathy decided to tell me that Justin had been arrested, I heard and saw in her; sadness, disappointment, stress, and the disbelief of what was happening. I couldn't comprehend the severity of the situation. I too, was shocked and in disbelief. Not Justin! Not my nephew!

The kid I helped to raise and have the privilege to see grow up. Kathy, myself, and our 2 boys lived together when Justin was 1 1/2 years old and Joseph 3 years old. In the 3 years we lived together, we didn't have much, in the aspect of financial stability. But what we did have were the important substantial qualities and values in life. Love, patience, empathy, consideration, & kindness. Even though we lived in tight quarters, and got into each other space, Mom & Kids learned to use love and patience. (Justin helped to teach me, forgiveness and patience. I don't think I ever thanked him for this.) He didn't complain that the neighborhood wasn't the white picket fence, big back yard family home. There were great parks around us to go to. Some of my best enjoyable memories to this day, is when we spent our time at the parks.

He always had a smile on his face. The only time that smile changed was when he had to wake up for school. Then he would just sit on the couch, next to his clothes and wander off into space. With a "we got to move along", he would move along, with the house flow.

I can remember a time when Joseph hit Justin for some reason, and I said to Joseph, "You aren't supposed to hit Justin, because you are mad at him. You are supposed to love him." And then telling Justin, "you know if Joseph hits you, it is okay to defend yourself". But Justin looked at me, and said, "But Aunty you said not to hit. I'm not mad at him, I love Joe." He was about 4 then.

Watching Justin over the years, looking after his mother and brother Melvin. From a very young age, I saw Justin take on the caring protective role of his mother. She has always been a strong guiding positive parent, as where his biological father didn't bother. Seeing this gave me a sense of pride and happiness. He is a product of his experiences and environment. Being an example of a good "child" model to his brother Melvin and step-siblings. Being the "Cool and fun" Big Cousin, playing with, and making the other cousins laugh.

I do not know all the details, and thought in everyone's interest, it was best not to. Due to being in a family of Police Officers; I don't do Face book, I don't surf the Intranet, I don't do YouTube, nor blogs, and try to avoid the news.

1

I'm not unrealistic in thinking that what has transpired, only effects Justin and his family. I feel sadness and confusion as to why some people choose certain actions. Not realizing the selfishness and or the negative impact their choices have effect on others.

Justin is a caring and respectable young man. He (like many of us, even after our teens and twenties) may make some bad decisions and or not so smart choices. The Justin I know has a conscious. He is still maturing and learning about life. I believe Justin will be that person who can be given a second chance, and not waste it. He will be the functioning, sufficient adult, who will contribute positively to society.

Thank you for allowing me your time.

**Tiffany Inocencio**
Sales Coordinator
Bay Alarm Company
Peninsula Branch
510 Myrtle Ave. Ste. 102 I South San Francisco I Ca I 94080

650-652-4202 I Fax 650-652-4260
www.bayalarm.com

Exhibit 5

Belmont, CA 94002

March 26, 2014

The Honorable Susan Illston
San Francisco Courthouse
450 Golden Gate Avenue
San Francisco, CA

Dear Judge Illston,

I am writing to you about Justin Whipple, a defendant in one of your cases.
I had the pleasure of getting to know Justin from January 2012 until May 2012. Justin and I
worked together at Peet's Coffee and Tea in Belmont. Justin and I took to being friends
rather quickly. He was caring, kind, and sweet. I often referred to Justin as my "work best
friend" because he was always doing things I would consider someone who was a good
friend to do. He would always remind me, and others, to be careful around all of the hot
liquid we worked with, and to always be cautious. He would often make sure that everyone
was comfortable and happy, and would volunteer to do things no one else wanted to do.
Justin was quiet, but he knew how to make you smile. Justin was kind to everyone he
encountered, fellow employees and customers. Justin was always smiling and was just a
general great person to be around. He could always cheer me up, and he always remained
so positive.

Justin would often talk about his mom and his little brother—he greatly loves them both. I
remember one conversation we had about when his mother had to go somewhere for work,
he was dong everything he could do to take care of his little brother while she was away. He
hurried to switch around his work schedule, and told me all about how he wanted to be
there for his brother, and be a good influence for him. I admired that a person of Justin's
age cared (and expressed it) so much about his mom and brother.

The last time I saw Justin was one I won't forget. I accidently spilled a boiling pot of coffee
all over myself, and Justin was the only one to help me. He quickly grabbed ice, towels, and
a new shirt for me, and asked what I needed. He got me burn cream, and stayed with me
until I got myself sorted out. I was glad that if anyone was there to calm me during the pain,
it was Justin. He made me smile, and laugh through it all—and I wouldn't have expected
anything different.

I hope that during this time, you will keep this information in mind in regards to the
charges against Justin. No matter the outcome, I want it to be known that Justin is a
compassionate, sweet and gentle person. Thank you for taking the time to listen to what I
have to say about Justin.

Sincerely,

Stefanie Nasir

Stefanie Nasir

Exhibit 6

**Date:**   March 28, 2014

**To:**   The Honorable Susan Illston

United States District Court, Northern District of California

Ninth Judicial Circuit

San Francisco, California  94119

**From:**   Jeffrey Vasquez

Menlo Park, CA  94025

**Re:**   Justin Whipple sentencing

Your Honor,

I had the privilege of working with Justin Whipple pin 2011 and 2012 at Peet's Coffee & Tea in Belmont. Justin was a pleasure to work with and an asset to have as a team member. Justin was always on time for his shifts, was a capable retail associate, and a positive presence to have in the store.

When I first began working at Peet's, Justin was already employed there. As a new employee Justin was a great resource for me to learn from. He was also very encouraging and patient with my learning curve.

I believe that Justin will be an asset to the local economy when he is released. Justin is a responsible young man that any employer would be happy to have. Justin enjoys being employed and I would expect him to acquire employment immediately upon his release. I have been a police officer for 25 years and I know Justin to be a quiet, shy, gentle young man. Whatever Justin has been convicted of I am sure that he confessed and is remorseful. I believe that when Justin is released he will return to the work force to be a contributing, participating member of society. I do not believe Justin to be a community safety risk.

Thank you for the opportunity to voice my concerns.

Jeffrey Vasquez

Exhibit 7



Peet's Coffee & Tea

Shannon Beggs

Daly City, CA 94014

March 28, 2014

The Honorable Susan Illston
United States District Court, Northern District of California
Ninth Judicial Circuit
San Francisco, CA 94119

Your Honor,

I had the pleasure of first meeting Justin Whipple in October of 2011 when he applied for a job at Peet's Coffee and Tea in my location. I found Justin to be polite, shy, timid, and well spoken. This was to be his first job. I hired him on the spot!

As we all began to get to know Justin, and he began to break out of his shell, we took an instant liking to him. He would speak fondly of his mother and his little brother. He took a responsibility for them that was touching. Justin was a responsible employee and a hard worker. We all, customers and employees alike, all took an immediate liking to Justin. He was our gentle giant. He was always courteous and helpful, often afraid of disappointing me or his fellow Peetnicks. He wanted to do a good job. He was always willing to help wherever needed without as much as a complaint. He was punctual and reliable. He often took new employees under his wings and was patient and encouraging while teaching them various functions of the job. He was a great addition to my team and I was very sad to lose him. I would also take him back without hesitation if he were ever to seek reemployment with me.

I have included a copy of his review from March of 2012 to show what a good job he was doing and how well he was thought of.

When Justin was first arrested, he sent me a letter apologizing for not coming to work. He felt concern for us, that he had somehow disappointed us. He also spoke of the great concern he had for his mother and younger brother. He was more concerned and heart broken about everyone else than about his own well being. I truly feel that Justin is not a threat to the community. I feel that as he was a productive, participating member of the community prior to his incarceration, he will once again be a productive member of society that we can all be proud of. I think Justin can do great things with his life and have a positive impact on those he interacts with.



I sincerely thank you for the opportunity to voice my opinion and experience with Justin. I do hope that you will take my words into consideration. If there is anything else you or he need from me, please do not hesitate to contact me.

Sincerely,

Shannon Beggs
Store Manager
Peet's Coffee and Tea
1200 El Camino Real
Belmont, CA 94002
(650) 593-3053



# Performance Review Form
## RETAIL ASSOCIATE

| Employee Name:  JUSTIN WHIPPLE | Reviewing Manager Name:  SHANNON BEGGS |
|---|---|
| Review Date:  March 2012 | Next Review Date:  March 2013 |
| Hire Date:  10/11/11 | Store Name & No.: BELMONT #236 |

## RATING DEFINITIONS

| Rating | Definition |
|---|---|
| Outstanding | Employees whose performance and quality of work far exceeded what was reasonably expected throughout the entire review period; additional and significant contributions were made to achieving business objectives. |
| Exceeded | Employees whose performance often exceeded job requirements; employees who were seen by others as the go-to person in their area of expertise or contributed significantly above what was expected to achieve business objectives. |
| Met | Employees whose performance consistently met job requirements; employee performed according to expectations and exceeded expectations in some areas; reflected high standards of performance. |
| Partially Met | Employees whose performance only partially met job requirements; performance was inconsistent and may have fallen below expectations in key areas. |
| Did Not Meet | Employees whose performance did not meet job requirements or business objectives; their performance requires immediate improvement and they must be on some form of performance counseling upon completion of the review cycle. |

## PART 1:  PERFORMANCE STANDARDS

| | Did Not Meet | Partially Met | Met | Exceeded | Outstanding | Supporting Comments |
|---|---|---|---|---|---|---|
| **Customer Engagement**  Employee ensures customers know they are welcomed and appreciated; understands what they want and helps them with what they need. | ☐ | ☐ | ☒ | ☐ | ☐ | Justin takes the time to offer customers several options to find out what the customer wants. He is friendly and welcoming. |
| **Clean and Well Organized**  Employee contributes through performing assigned tasks to ensure all areas in store are maintained; clean and well organized and reflect the quality of our brand. | ☐ | ☐ | ☒ | ☐ | ☐ | Justin completes all given tasks. He is good at keeping things stocked. |
| **Unequalled Quality**  Employee performs consistent delivery of the highest quality coffees, teas, beverages and baked goods in accordance with Peet's distinguishing quality standards. | ☐ | ☐ | ☒ | ☐ | ☐ | Justin strives to give customers what they want. He is excellent at problem solving and serving gold standard products. |
| **Speed of Service**  Employee demonstrates that customers come first by serving them with a sense of urgency. | ☐ | ☐ | ☒ | ☐ | ☐ | Justin serves with a sense of urgency but needs to learn when to ask for help. |



**Performance Review Form**
**RETAIL ASSOCIATE**

## PART 2: OVERALL PERFORMANCE RATING

| ☐ Outstanding | ☐ Exceeded | ☒ Met | ☐ Partially Met | ☐ Did Not Meet |
|---|---|---|---|---|

## PART 3: SUMMARY COMMENTS REGARDING EMPLOYEE'S OVERALL PERFORMANCE

*Give a one paragraph summary of the employee's performance on his/her performance standards during this review period. Also, take into consideration the employee's performance in the areas of Cash Handling, their Reliability Record, Time Edit Log entries, and any other performance concerns or highlights. In your feedback, try to give specific examples of how the employee embodied Peet's Values of Mastery, Curiosity, Responsibility and Prosperity.*

Justin is firendly and welcoming. Customers (and staff) love his addition to the team. He strives to serve the best quality product every time. He often offers several options to customers to ensure they are getting exactly what they want. I look forward to seeing his growth with the company.

## PART 4: SIGNATURES

Signatures indicate both employee and manager have jointly reviewed and discussed this Performance Review Form.

_Justo Milvaple_      _3/20/12_
Employee Signature       Date         District Manager Signature        Date

_Shann — Ji Pegg_     _3/20/12_
Store Manager Signature      Date

Exhibit 8

25th March 2014
To the Presiding Judge,
Susan Illston

Re: Character Reference for Justin Whipple

Your Honor,

My name is Diana Becerra and I am writing this letter, on my own initiative in hopes that it will benefit Justin Whipple during his trial. I am a former co-worker of Justin's, we worked together at Peet's Coffee & Tea in 2012, for about six months. During this time, I have known Justin to be a kind, thoughtful and well-mannered person. He was a great worker, positive and fun to be around. I noticed right away, he was well liked with our guests, he was always striking up conversation with our regular customers. When talking about his personal life, he expressed great respect and concern for his mother and younger brother all of the time. I have always remembered how heartwarming that made me feel. I understand that Justin has pleaded guilty to his charges, and I truly hope he can serve his time, and become a contributing, functioning member of society in the future.

Thank you for taking the time to read this letter, and if you wish to verify any of the above statements, please do not hesitate to call.

Diana Becerra

San Bruno, Ca. 94066
415-375-1967 cell
650-931-8181