1   STUART HANLON, CSBN: 66104
LAW OFFICE OF HANLON & RIEF
2   179 11th Street, 2nd Floor
San Francisco, CA 94103
3   t. (415) 864-5600
f. (415) 865-0376
4
Attorney for Defendant BENJAMIN CAMPOS-GONZALEZ
5

6              IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   UNITED STATES OF AMERICA,          Case No.:  12-CR-00119 SI

            Plaintiff,
10
                                       DEFENDANT'S SENTENCING
11  vs.                                MEMORANDUM

12  BENJAMIN CAMPOS-GONZALEZ,

            Defendant.
13

14

15

16

17

18

19

20

21

22

23

24  DEFENDANT'S SENTENCING MEMORANDUM - 1

Mr. Benjamin Campos-Gonzalez was first indicted in this matter in 2012 and charged with death penalty eligible crimes. The death penalty hung over his case for approximately one and a half years until the government determined not to seek the death penalty.   Mr. Campos-Gonzalez then faced charges that carried three mandatory life-without-parole sentences, with additional multi-decade terms.

Though many of the original 19 charged defendants entered guilty pleas to various crimes, where most sentences pursuant to plea agreements exceeded 10 years, Mr. Campos-Gonzalez, refused to plead guilty because he maintained his innocence.  He refused to accept the government's final settlement offer of 20 years to resolve his case.

Mr. Campos-Gonzalez proceeded to trial with 3 co-defendants facing three mandatory life sentences. The trial took over 3 months; the Honorable Court heard all of the witnesses and, like the jury, was and is in a position to judge the credibility and trustworthiness of the government witnesses, as well as that of Mr. Campos Gonzales.

As discussed below, almost all the evidence against Mr. Campos-Gonzalez was uncorroborated hearsay:

1. Magali Flores testified to statements allegedly made by co-defendant Joseph Ortiz as well as her alleged observations regarding a jewelry store robbery after the fact; also a 7-11 convenience store robbery in which she was a co-conspirator, and alleged gang activities.

2. The alleged statements of Joseph Ortiz via ranking Nuesta Familia informant Todd Tonnochy; this witness also introduces hearsay statements of co-defendant Rodrigo Aguayo and Adrian Gutierrez.

DEFENDANT'S SENTENCING MEMORANDUM - 2

3.   Nuestra Familia informant and former high ranking member Shane Bowman testified to gang activities unrelated to Mr. Campos Gonzales; he further testified to his " investigation" of the 12/22 triple homicide, introducing more unsubstantiated hearsay.

4.   Michelle Herrera testified regarding various alleged gang activities involving Mr. Campos-Gonzalez and uncharged alleged criminal acts.

5.   Former NF leader and now informant Joseph Jones testified regarding 500 Block and Nuestra Familia activities in the early 2000s.

This unsupported and multiple level hearsay was the entirety of the direct evidence against Mr. Campos-Gonzalez involving the triple homicide; and primarily the evidence against him in all robberies and gun crimes other than a video of the jewelry store robbery (discussed below).

Circumstantial evidence allegedly supporting the charges can be summarized as follows:

1.   Cell tower and phone record evidence testified to by an FBI expert, allegedly linking him to those clearly involved in the shooting and thus the "murder car";

2.   Alleged statements by Mr. Campos-Gonzalez when he was booked in various local and state prisons regarding Northerner affiliation;

3.   The fingerprint of a co-worker of Mr. Campos-Gonzalez (Ruven Guardado) on a firearm manual found in Joseph Ortiz's car;

4.   Evidence of two incidents that led to state court convictions (gun possession and felony destruction of property) and some police contacts with others who grew up with him and who were alleged to have gang affiliations; and

5.   Other evidence discussed in the Memorandum.

In the face of this evidence, the jury carefully deliberated the case against Mr. Campos-Gonzalez for a number of days.  That jury rejected the hearsay evidence of all the government witnesses and the alleged circumstantial evidence presented by the government and acquitted Mr. Campos-Gonzalez of all charges but Count One; as to this Count, the jury rejected a special finding and found that he did not partake in the RICO conspiracy for the purposes of murder or attempted murder.

It is clear from the verdict against Mr. Campos-Gonzalez that the jury rejected any charges based in large part on the testimony of government informants – Magali Flores and/or Michelle Herrera — and rejected the hearsay evidence allegedly made by any of the NF government informants.  The same jury found the video of the jewelry store robbery unconvincing as it relates to Mr. Campos-Gonzalez, and the cell tower and phone records nothing more than circumstantial evidence subject to various reasonable interpretations, and not evidence of guilt in the triple homicide.   Further, it is clear from the questions of the jury they did not even find Mr. Campos-Gonzalez was a member of the enterprise known as C-Street or 500 Block, but rather that he in some form or another conspired with members of said enterprise.

The jury verdict was in large part a total victory for Mr. Campos-Gonzalez.  The government refuses to accept the verdict of the jury and it has convinced the probation officer, through private meetings and particularized submission of evidence, that the defendant is in fact guilty of all the charges for which he was acquitted.  The government and the probation department are attempting to turn the jury system on its head and make it a meaningless exercise

DEFENDANT'S SENTENCING MEMORANDUM - 4

1    and ask that Mr. Campos-Gonzalez receive the maximum possible punishment under Count One

2    or 20 years.[1]

3            As discussed below, the Court can, under present Ninth Circuit precedent, re-weigh the

4    evidence of the acquitted counts to determine an appropriate sentence based on relevant conduct.

5    But the case law does not mandate that the trial Court must do this or in fact should do this –

6    rather that the Court can, under particular facts of a particular case, engage in such a process.

7            As argued below, this Court should not engage in such a reweighing of the jury verdicts

8    given the nature and type of evidence relied upon by the Government.  This Court must not

9    revisit the jury's determination of the credibility of the Government witnesses, and the weight to

10   be given to its unreliable hearsay, or the import of circumstantial evidence susceptible to various

11   interpretations, especially when there is no evidence to corroborate this circumstantial evidence-

12   no scientific evidence, no eye witnesses, no physical evidence.  This Court should accept the

13   jury's verdict and in fact uphold the jury system.  No other approach to the sentencing in this

14   case makes sense or is fair.

15

16   ————————————————

17

18   [1]  There has been through correspondence, and the Probation Report itself, back and forth between counsel and the
     Probation Officer regarding the process of getting information and the preparation of the report.  The Probation
19   Officer is quite clear in his report that he chose to meet with the government's attorneys to go over their case and to
     determine what the evidence was.  It is also clear that defense counsel submitted some evidence to the Probation
20   Officer and invited him to contact him if he wanted further information.  The Probation Officer did not do so and did
     not request any meeting with defense counsel as he did with the government's attorneys.  Defense counsel after the
     initial draft report did submit many pages of testimony of witnesses from the trial as well as defense counsel's
21   closing argument.  It is unknown if the Probation Officer reviewed these documents.  However, the process of the
     Probation Officer is not really at issue here.  The Probation Officer attempted to do his job as he saw his obligations
22   under the law.  The Court will review the Probation Report and take from it what the Court feels is appropriate.
     Defense counsel's point remains that it is for the Court to determine whether or not it should reweigh the evidence
     of acquitted crimes (and under what standard) to determine what predicate acts or relevant conduct should be used to
23   determine the appropriate sentence within the 20 year statutory maximum for Count One.  Counsel believes that the
     Probation Officer is not in a position to make these determinations..  At the same time, counsel continues to respect
     the difficult issues this case presented to the Probation Officer and his attempts to address these issues.

1    When the Court accepts the jury verdict and refuses to re-weigh hearsay evidence,

2    credibility determination, and circumstantial evidence, the Court must sentence the defendant on

3    Count One for the predicate acts of distribution and possession with intent to distribute a

4    controlled substance and/or conspiracy to distribute and possess with intent to distribute a

5    controlled substance, which leads to a sentence nowhere near where what the government and

6    probation officer request- a sentence of approximately five years.

7                                    **STATEMENT OF FACTS**

8    **1. Evidence against Defendant**

9    Counsel believes it is important for the Court to have a detailed analysis of the evidence

10   as to each count against Mr. Campos-Gonzalez.  Such knowledge is clearly necessary for the

11   Court to determine if it should reweigh the acquitted counts for sentencing purposes.

12   **A.  The Homicides**

13   The primary evidence against Mr. Campos-Gonzalez regarding the murders is the hearsay

14   testimony of Magali Flores and Todd Tonnochy.  Neither of them are eyewitnesses to the crime

15   but each allegedly relay statements of Joey Ortiz to them about the shooting; Mr. Tonnochy also

16   testified as to hearsay statements allegedly made by Rodrigo Aguayo and Adrian Gutierrez.

17   None of these witnesses' testimony is credible, believable or supported by any other evidence.

18   In fact, Magali Flores' testimony that Joey Ortiz told her that there were four people in the car at

19   the time of the December 22, 2010 murder and the fourth was Mr. Campos-Gonzalez is

20   contradicted by all other persons – including Tonnochy-who saw the car that evening or who

21   talked to other participants in the murder about the number of people in the car; all other people

22   saw or heard of only three people in the car and none of those people testified that Mr. Campos-

23   Gonzalez was one of those three people.

1    Magali Flores was an informant who initially was not going to be prosecuted for her

2    alleged involvement in robberies and aiding and abetting the December 18th shooting by loading

3    the guns for Joey Ortiz or in helping him escape and obstruct justice.  She was only prosecuted

4    after she broke her agreement with the government and ran away to be with Joey in Mexico after

5    her grand jury testimony.  After days of cross-examination, she had no credibility. She admitted

6    lying on various occasions to police officers and federal agents; she testified that she could "look

7    him straight in the eye and lie, and you wouldn't even know it." RT at 2693.

8    She lied to the jury about her own cocaine possession in jail. RT at 2893-3142.  She

9    admitted to being a good liar when in her lengthy phone call with Joey Ortiz, she convinced him

10   that she was not cooperating with the government when in fact the police were in the room with

11   her, feeding her incriminating questions, and listening to her conversation on speaker phone.

12   Finally, she lied when she told the jury that she was afraid she could get 15 years in

13   prison from this Court.   Ms. Flores was confronted with a transcript of a hearing where she was

14   present with counsel when AUSA Acadia Senese advised the Court, in response to a direct

15   question from the Court regarding the government's position on the ultimate sentence that Ms.

16   Flores would receive based on her cooperation, that if Ms. Flores continued to cooperate she

17   would do no more than the approximate 18 months she had already served in jail.  In response to

18   this, Ms. Flores could only say that she did not remember that part of the hearing.

19   Not only did Ms. Flores not have any credibility or believability, her testimony as to the

20   murder was conflicting and contradictory. Though she testified at trial that Joey Ortiz told her

21   that Mr. Campos-Gonzalez was the driver and did not shoot, she does not remember testifying in

22   front of the Grand Jury that Joey Ortiz, Victor Flores, and Mr. Campos-Gonzalez jumped out of

23   the car, they all had guns and started shooting.  RT at 2783.  She further contradicts herself by

DEFENDANT'S SENTENCING MEMORANDUM - 7

1   testifying that Joey Ortiz told her after the shooting that he drove Justin Whipple and Victor

2   Flores back to Flores' apartment in South San Francisco and then drove Mr. Campos-Gonzalez

3   back to his home in San Mateo.  She denies telling the police on her first interview on May 11th

4   that Joey dropped them all off on First Lane in South San Francisco, where Mr. Campos-

5   Gonzalez already had his car (RT at 2880); and when arrested in Mexico with Joey Ortiz, she

6   gave a statement to South San Francisco police that all she told them in the past was a lie; but

7   then two months later changes her story yet again and says that statement was a lie.

8          The Court got to hear and watch Ms. Flores testify.  Counsel is not going to repeat all her

9   lies and contradictions from the trial.  What is clear from the jury's verdict is that they did not

10   believe Ms. Flores in any way, did not find her credible, and would not convict on her hearsay

11   testimony regarding what Joey Ortiz told her- or on any crime where her testimony was not fully

12   corroborated by independent evidence (there was no such crime).

13          Todd Tonnochy was the second government informant to testify as to hearsay from Joey

14   Ortiz and another co-defendant – Rodrigo Aguayo.  Mr. Tonnochy also lacked any credibility.

15   He was reaping the benefits of a plea agreement with the government for many crimes that he

16   had committed.  He had a history of violent crimes, theft crimes, and only agreed to cooperate

17   when he negotiated himself a deal with the South San Francisco Police.

18          Though he did tell the police that Joey Ortiz told him soon after the shooting that Mr.

19   Campos-Gonzalez was involved, he contradicted the alleged story by Joey Ortiz to Ms. Flores

20   that Mr. Campos-Gonzalez was the driver of the car.  Mr. Tonnochy told the police and this jury

21   that Joey Ortiz told him that he was with Mr. Campos-Gonzalez in Orange Park when Joey Ortiz

22   and Mr. Campos-Gonzalez hopped in the car "with some homie" driving and that Mr. Campos-

23   Gonzalez and Joey Ortiz shot the people.  He maintains there were only three people in the car

1   and that Joey never told him that Mr. Campos-Gonzalez was the driver or that there were four

2   people in the car.  RT at 2113-2114.

3        He further testified that a co-defendant, Rodrigo Aguayo, told him that Mr. Campos-

4   Gonzalez was involved; however, all his interviews with law enforcement in this case belie this

5   testimony in that he never told law enforcement that Mr. Aguayo said that Mr. Campos-Gonzalez

6   was involved, even when telling them what Mr. Aguayo told him.  RT at 2115-2118.

7        Further, he contradicted the government's theory of why the shooting took place by

8   telling the police on at least three occasions that the shooting occurred because of a drug deal

9   gone bad – the drug deal being between Joey Ortiz's brother, Mikey Ortiz, and a man named

10  Octavio from CPL.  Mikey was allegedly ripped off and Joey wanted revenge.  RT at 2120-2122.

11       Again, this Court heard Mr. Tonnochy testify and heard the many contradictions which

12  left him with little or no credibility including his motives to lie to curry favor with the police and

13  prosecutors.  His testimony in major part contradicts that of Magali Flores and, just like her

14  testimony, is unsupported by any physical evidence backing up anything he says including any

15  phone records or wiretap information supporting his allegations. He concluded his testimony by

16  admitting he had engaged in witness intimidation and had no respect for the legal system and put

17  the law of the NF over the law of the federal courts.

18       Shane Bowman was another government Nuestra Familia informant called to testify.  He,

19  like Tonnochy, was offered benefits in his pending cases – which were extremely serious – to

20  testify in this and other cases.  He knew very little about 500 Block or C Street gangs because he

21  was not from that area; he did admit, however, that Mr. Campos-Gonzalez's tattoos were not

22  necessarily or particularly gang related.  RT at 3621-3624.  Regarding the murder, he testified

23  that he was given the job to "investigate" the red-on-red homicide for the NF.  His "investigation"

1   made the following findings:  The murders were done by Joey Ortiz with two other people in the

2   car; he stated that Mr. Campos-Gonzalez, when he talked to him in jail, made no admissions of

3   involvement in the crime; and he testified that his investigation showed that Joey Ortiz did the

4   crime because of a dope deal involving his brother Mikey.  He concluded that there were only

5   three people in the car.

6          Thus, his testimony contradicts that of the hearsay of Magali Flores as to the number of

7   people in the car.  The testimony of these witnesses is the sum and total of all direct evidence

8   linking Mr. Campos-Gonzalez to the homicide.  It is important to state there was no fingerprint,

9   DNA or ballistic evidence linking Mr. Campos-Gonzalez to the crime.  In fact, the fingerprint

10  and DNA evidence clearly incriminates Joey Ortiz, Michael Ortiz, Victor Flores, and Justin

11  Whipple regarding the homicide and the murder vehicle- but not Mr. Campos-Gonzalez.

12         Finally the defense called a last NF informant, Robert Alarid.  Although Mr. Alarid was

13  originally an informant for the government, the prosecution did not call him as a witness for

14  reasons that became clear during his testimony. He, like Bowman, was placed in a Redwood City

15  Jail cell to gather information from Joey Ortiz.  He was next to Joey Ortiz for a week and took

16  contemporaneous notes on his statements.  He heard Joey say, and wrote down at the time, that

17  the triple murder was done by Joey, his brother Mikey and Rodrigo Aguayo.  Mr. Alarid was

18  sure of this statement made by Joey Ortiz.

19         This testimony contradicts Magali Flores as to what Joey Ortiz said about the number of

20  people in the car and who they were- specifically with regards to Mr. Campos Gonzalez's

21  involvement.  As importantly, it shows the lack of credibility of Joey Ortiz, the alleged source of

22  all these statements.  Just as there is no reason to believe Magali Flores and Todd Tonnochy,

23

DEFENDANT'S SENTENCING MEMORANDUM - 10

1 there is no reason to believe as truth whatever Joey Ortiz says, even if for the sake of argument

2 one is to believe that Joey Ortiz ever made these contradictory statements.

3   A number of eyewitnesses to certain incidents prior to the shooting and the shooting itself

4 testified.  None of these witnesses linked Mr. Campos-Gonzalez to the crime in any way.  The

5 majority of them ultimately contradicted Magali Flores' hearsay and the government's key

6 theory of four people in the car including Mr. Campos-Gonzalez as the driver:

7   Valente Gonzales testified that he was near the scene of the homicide at approximately

8 6:30 or 6:00 p.m.  RT at 1189.  He was walking on First Lane, when he saw the Impala drive up.

9 He recognized Joey Ortiz and Victor Flores and was not sure if the other person was Joey's

10 brother Mikey Ortiz or not.  At trial, he testified there were three or four people in the car and

11 that the men were all wearing black and were mostly bald.  RT at 1190-1192.  Soon after seeing

12 the car, he heard the shots.  RT at 1193-1194.

13   As brought out in cross-examination and in his original statements to the police, Mr.

14 Gonzalez believed that Joey Ortiz was in the back of the car and Mikey, Joey's brother, was the

15 driver.  RT at 1260.  In his second interview, he told the police that he was sure there were only

16 three people in the car.  Again, the people were described as bald, not with short hair.  RT at

17 1271.

18   When presented with a photo lineup by the police, Mr. Gonzalez was shown a picture of

19 Mr. Campos-Gonzalez.  He said he knew him through school, and Mr. Campos-Gonzalez always

20 had long hair.  He was sure that he never saw Campos-Gonzalez, a person he knew, in the car.

21 RT at 1274.

22   Ignacio Contreras saw the car used in the murder on two occasions within an hour of the

23 shooting.  When he first saw the car, he testified at trial that he saw two people in it and

DEFENDANT'S SENTENCING MEMORANDUM - 11

1   recognized one of them to be Joey Ortiz.  He later testified he saw the car and saw Joey Ortiz and

2   Victor Flores in the car.

3          On cross-examination, he admitted that when he first talked to the police, he told them he

4   saw three people connected to the car.  The police showed him pictures to identify the other

5   person including a picture of Mr. Campos-Gonzalez.  He testified that he knew Mr. Campos-

6   Gonzlez well because they had been to jail together and they were friendly even though Mr.

7   Campos-Gonzlez was associated with C Street and he was in CPL. He told the police that the

8   third person in the car could not have been Mr. Campos-Gonzalez because he knew him and it

9   was not him.  If it had been Mr. Campos-Gonzalez, he would have recognized him.  RT at 3394-

10  3395.  Ultimately, his testimony was that he saw three people in the car including Joey Ortiz and

11  Victor Flores and the third person could not have been Mr. Campos-Gonzalez.  RT at 3405-3406.

12         Martin Brown was with the victims when they were shot.  He could not see into the car

13  and does not know how many people were in it.  He was 15 feet away from the car when one of

14  the shooters got out and began shooting.  He identified that person as someone he knew, Justin

15  Whipple, who has pled guilty to involvement in the murder.

16         Rafael Tavake was also an eyewitness to the car leaving the scene of the shooting.  Mr.

17  Tavake was in his home with his child when he heard the shooting.  After moving the baby to

18  safety, he ran to look to see what was going on.  He had a brief view of the car as it drove

19  towards him and then past him.  At trial, he said the passenger had a shaved head and could not

20  describe the driver.  He was definite that there were three people in the car – two in the front and

21  one in the back.  RT at 7221-7223.

22         Two other witnesses testified to hearsay statements of co-defendant Victor Flores – his

23  two ex-girlfriends, Melissa Pacheco and Dana Pacheco.  Melissa Pacheco testified that she knew

DEFENDANT'S SENTENCING MEMORANDUM - 12

1    the name of Mr. Campos-Gonzalez but really knew his brother, Andrew Campos; she never met

2    Mr. Campos-Gonzalez.   RT at 5134.  She testifies to admissions by Victor Flores to her about

3    his involvement in the homicides:  Mr. Flores told her that they were in the Impala and they got

4    up and shot people.  She says that Mr. Flores said the people involved were himself, Joey Ortiz,

5    and Justin Whipple.  RT at 5150.  Mr. Flores told her that he and Mr. Whipple were in the car

6    with Joey Ortiz and there was no one else in the car; it was just the three of them.  RT at 5218-

7    5219.

8           Her sister Dana Pacheco also testified.  Dana was called by the government to testify that

9    although Victor Flores confessed his own involvement in the homicide, he never told her who

10   was with him on December 22nd.  It was clear that Mr. Flores told her what he did but not who

11   was with him.  RT at 5042.

12          The above is a summary of testimony and direct evidence regarding the actual murders -

13   there was no eyewitness, physical evidence, or scientific evidence linking Mr. Campos-Gonzalez

14   in any way to the murders.  The Probation Officer cites two areas of circumstantial evidence

15   which he believes show Mr. Campos-Gonzalez's guilt.  It is clear from the jury's verdict, they

16   did not find this evidence compelling, because it is not.

17          The first is the testimony of Ruven Guardado.  Mr. Guardado was a former co-worker of

18   Mr. Campos-Gonzalez and Giovanni Ascencio at a sign company.  He testified about being with

19   the two of them at a company party on a boat on the day of the shooting and dropping both Mr.

20   Ascencio and Mr. Campos-Gonzalez off in South San Francisco late in the day.    Multiple

21   fingerprints of Mr. Guardado were found inside a gun manual that was found in the trunk of Joey

22   Ortiz's car – the murder car.  Mr. Guardado was then questioned soon after the shooting and he

23

DEFENDANT'S SENTENCING MEMORANDUM - 13

1   stated he had no idea how it could have gotten there.  At least two of his prints were on inside

2   pages of the manual.

3        At trial, he testified that he shared a cubby at work with Mr. Campos-Gonzalez and Mr.

4   Ascencio and that he remembered seeing a gun manual that he picked up.  He said at one point

5   "he touched it real quick and put it back where it was."  RT at 5073.  Further, he believed that he

6   picked up the manual to move it from the cubby.  RT at 5104.  He also may have touched it and

7   threw it back in the cubby.  RT at 5105.  He admitted he did not have a clear memory of it (RT at

8   5120) because he had "smoked pot and drank a lot."  RT at 5108.

9        Sarah Potter, an attorney who worked on the defense case, testified to a conversation she

10  had with Mr. Guardado prior to his testimony when he called the office regarding the subpoena

11  that had been issued to him.  He stated to Ms. Potter that he had been in the car many times and

12  does not remember when he could have gotten his fingerprint there.  Mr. Guardado denied

13  making these statements to Ms. Potter.

14       This evidence is basically irrelevant as circumstantial evidence of Mr. Campos-

15  Gonzalez's guilt.  It is the fingerprint of Mr. Guardado on a gun manual and not a gun used in the

16  crime.  The fingerprint could have gotten there by Mr. Guadado being in the car and having

17  touched the manual; Mr. Guadado himself could have left the manual in the car; it could have

18  gotten there by Mr. Ascencio (a codefendant in this case) putting it in the car if in fact Mr.

19  Guardado's present testimony is true that it was left in the cubby that he shared with Mr.

20  Ascencio and Mr. Campos-Gonzalez; or it could have gotten there by Mr. Campos-Gonzalez

21  placing it in the trunk.  Mr. Campos-Gonzalez testified that he had been in Joey Ortiz's car

22  previously.  None of this proves, even circumstantially, who was in the car on the day of the

23  homicide, and in particular, whether Mr. Campos-Gonzalez was there that day.

DEFENDANT'S SENTENCING MEMORANDUM - 14

The second piece of circumstantial evidence commented on by the Probation Officer is the cell phone and cell tower records brought in through the FBI expert and through phone company experts.

The phone records show communication on the day of the incident by phone between Mr. Campos-Gonzalez, Joey Ortiz, Victor Flores, and to some extent Justin Whipple. The cell tower records show the placement of individuals including Mr. Campos-Gonzalez prior to and after the crime. These records also indicate a period of phone silence between all four people prior to and for about ten minutes after the shooting. At first these records seem to be compelling evidence; however, after cross-examination of the cell site tower expert, and the testimony of Mr. Campos-Gonzalez, this evidence is nothing more than circumstantial evidence that has at least two reasonable interpretations. Mr. Campos Gonzales in his testimony offered a reasonable explanation of these facts that is exculpatory and was believed by the jury.

The cell tower expert testified for the government for a period of days. Some of his testimony is that Mr. Campos-Gonzalez was at certain times using the same cell towers or nearby cell towers to those of Joey Ortiz, Victor Flores, and Justin Whipple. However, it became evident that cell tower evidence is not an exact science and cannot tell with any particularity the exact location of phones at particular times; phones can use the same tower or nearby towers when the phones are a great distance from each other even when different phones are on the same network of a particular provider. Phones can use a particular tower when they are moving and it is impossible to tell if that tower is being used when that person is stationary or in movement.; because of heavy phone traffic, phones can use towers that are not the closest to the phone; physical and environmental factors can effect which tower a phone uses; towers can cover a large area, and the coverage area of a particular tower cannot be known with testing that

1   was not done in this case; towers have directional areas of coverage (usual three for 360 degrees)

2   but on many of the relevant towers the FBI did not gather the information of the direction of the

3   tower.

4            Mr. Campos-Gonzalez testified where he was at certain times, why he was there, what he

5   did after being dropped off in South San Francisco after the company party, why at certain times

6   there was not any communication with Joey Ortiz, Mr. Flores and/or Whipple, and why at some

7   point before the homicides he turned off his phone.  Mr. Campos-Gonzalez testified after the

8   phone expert testified.  If anything in his testimony was contradicted by cell tower information,

9   the government was in the position to call back the same expert or another nearby FBI expert.

10  The government chose neither.  Clearly, the jury did not believe that the cell tower evidence

11  proved Mr. Campos Gonzelez's guilt beyond a reasonable doubt as they found him not guilty of

12  the homicides.  Under the standard of clear and convincing or even a preponderance of the

13  evidence, this Court cannot say that this evidence proved Mr. Campos-Gonzalez was guilty or

14  committed perjury.  It certainly cannot prove him guilty given the lack of any other substantial

15  evidence pointing towards his guilt. Circumstantial evidence that is susceptible to two reasonable

16  interpretations does not by definition reach the level of proof by a preponderance as both

17  interpretations are reasonable.

18           The issue of the number of people in the car at the time of the murder is very important to

19  understanding the import, or lack of probative value, of the cell tower and phone record evidence.

20  All witnesses say there were only three in the car (see discussion above), other than the alleged

21  statement of Joey Ortiz via Magali Flores, who says four. If there are only three- which the

22  weight of the evidence supports- then this is proof that Mr. Campos-Gonzales was not in the car

23  at the time of the murders.  It is now uncontradicted that Joey Ortiz, Victor Flores and Justin

1   Whipple (fingerprint inside car, eye witness identification by Mr. Brown, and guilty plea) were

2   the three people in the car.

3          Thus the phone records and cell tower records, that at first blush link four phones, are

4   misleading, or at a minimum subject to multiple reasonable interpretations because the evidence

5   is clear that there were only three persons in the Impala at the time the two shooters got out and

6   fired.

7   **B.  The Robberies**

8          The government charged Mr. Campos-Gonzalez with conspiracy to commit robbery and

9   two particular robberies -- the jewelry store and the 7-11.  The government's proof on both cases

10  is based in large part on the testimony of Magali Flores.

11         As noted above, Ms. Flores was impeached continually through her cross-examination

12  and her own admissions.  The 7-11 robbery is based solely on her testimony in that the video of

13  the robbery shows only Joey Ortiz in the store. There is absolutely no corroboration of her story

14  about this robbery. Given her lack of credibility, her impeachment on almost all of her testimony,

15  and her motive to lie about Mr. Campos Gonzales- he was the person on December 18, 2010

16  who told Joey Ortiz about Ms. Flores hanging out with Eastside persons, leading to a fight

17  between Ms. Flores and Joey where he punched her knocking her to the bed- under no standard

18  of proof could this charge by proved.

19         The proof offered on the defendant's guilt for the jewelry store robbery is based on Ms.

20  Flores' hearsay statement of what Joey Ortiz allegedly told her as well as the alleged presence of

21  Mr. Campos-Gonzalez at her house after the robbery, and the video of the robbery.

22         She testified that she was not at the jewelry store robbery but after the robbery Joey Ortiz

23  came to her home with Mr. Campos-Gonzalez who carried a pink backpack which held the

1    jewelry and cash from the robbery.  She said Mr. Campos-Gonzalez waited outside when Joey

2    Ortiz brought the jewelry into her bedroom. Her testimony is full of contradictions based on prior

3    statements. She previously told the police that Joey Ortiz came to her house without Mr.

4    Campos-Gonzalez (RT at 2788); she told law enforcement that she overheard Joey talking about

5    the robbery with some unidentified person and not that he told her directly about it (RT 2791-

6    2797); she told law enforcement that Joey told her that Mr. Campos-Gonzalez was the driver of

7    the car and that another person robbed the store with Joey.  RT at 2890.

8         There was no corroborating evidence regarding her claims of Campos-Gonzalez's

9    involvement in the robbery.   There is no evidence that Mr. Campos-Gonzalez ever provided

10   anyone with, or that he ever sold, the jewelry as Joey Ortiz did.  There is no evidence of anyone

11   ever seeing him with jewelry from the robbery or suddenly coming into a large amount of cash.

12        The government makes much to do about the video in the jewelry store and argued that it

13   clearly shows Joey Ortiz and one other person in the store who they have argued is clearly Mr.

14   Campos-Gonzalez, who can be identified by his appearance and his voice.

15        The problem is that the jury saw the video at least 10 times during the trial and unknown

16   times during deliberations.  Clearly, the jury did not believe that the video showed or proved that

17   it was in fact Mr. Campos-Gonzalez -or they would have convicted him.

18         The defense position is that there is no clear proof, either in voice or facial and body

19   features, that it is the defendant. He testified it is not him.

20        The Court is in no better position than the jury to determine the import of that video.

21   Whether the Court looks at it as a standard of beyond reasonable doubt, clear and convincing or

22   preponderance of the evidence; the Court cannot under these sets of facts and this type of

23

24   DEFENDANT'S SENTENCING MEMORANDUM - 18

1    evidence reject the jury's finding and make its own determination. To do so would allow the

2    Court to simply substitute its own opinion for that of the twelve jurors.

3    **C. Other Evidence**

4    The government presented other evidence in this case including the testimony of

5    informants Michelle Herrera and Joseph Jones. Neither of them offered any direct evidence

6    bearing on the acquitted charges at issue in sentencing. Neither of them has much credibility on

7    any issue that the jury faced. Ms. Herrera had a melt down and panic attack on the witness stand

8    she had almost a total loss of memory that she blamed on her pregnancy, and she was caught in

9    numerous inconsistencies and outright lies. Mr. Jones had little to offer on any issues. His

10   knowledge of 500 Block was irrelevant as it dealt with a period of time almost a decade before

11   the involvement of Mr. Campos Gonzales when the membership and connection to the NF of

12   500 Block/C Street was totally different.

13   The government offered evidence of statements by Mr. Campos-Gonzalez when he was

14   booked into certain jails or prisons. He never claimed membership in a gang but called himself a

15   Northerner for housing purposes. These admissions do not prove a commission of any crime

16   either directly or indirectly, nor do they prove that he was a member of C Street gang or that he

17   committed perjury when he testified that he was not a member of a gang.

18   The government spent a lot of time proving Mr. Campos-Gonzalez's involvement in the

19   La Quinta incident. Mr. Campos-Gonzalez pled guilty to felony destruction of property by

20   kicking the car. He did not plead guilty to robbery or assault. The testimony of law enforcement

21   officer Carpenter sheds light on Mr. Campos Gonzalez's involvement in this incident. He

22   interviewed the alleged victim of the La Quinta incident (also a witness in this case) immediately

23   after the incident. He testified that the victim told him that Mr. Campos-Gonzalez was not

1   identified by her as having been in any fights in the hotel, or at her car; she said she had never

2   seen him inside the hotel but only as the driver of the car she followed and one of the persons

3   who kicked her car.  RT at 4483-4484.  She said she did not see him at the party itself.  RT at

4   4485.

5          There is no evidence that shows the defendant robbed anyone at the hotel, attacked

6   anyone, or yelled gang threats at the victim or threw gang signs during the incident. He was high

7   and acted inappropriately and criminally by kicking her car and that is what he pled guilty to.

8          Mr. Campos-Gonzalez conviction for this crime, as well as the ex-felon with a gun, and

9   misdemeanor possession of mushrooms, are a matter of record. Relevant to sentencing, these

10  convictions cannot, pursuant to the Guidelines, be used as predicate acts for sentencing purposes.

11  U.S.S.G. §2E1.1, Application Note 4.  The evidence may have been used to have the jury find

12  him guilty of Count One in terms of association with the enterprise.  It did not prove anything

13  beyond that.

14         Finally, there was much evidence introduced at trial regarding the symbols of the

15  Nortenos- graffiti, wearing red, gang signs, and monikers - none of which were shown to apply

16  to Mr. Campos Gonzales.  His tattoos are not classic or known gang tattoos, based on the

17  testimony of government witnesses including Mr. Bowman.  In the many photos of defendants

18  and in the description of clothing worn by Mr. Campos Gonzales at the times of his arrest, there

19  is little evidence of him wearing red other than 49er jersey; he is not seen throwing gang signs,

20  though in his testimony he admits he did it a few times because he associated himself with his

21  friends from C Street; his moniker, "BG", unlike the many heard in the trial, stands for his

22  initials -  Ben Gonzalez - and he has been called "BG" by his family since he was a child.

23

1    Finally, his drawing and kite introduced into evidence proves nothing in relationship to the issues

2    presented for sentencing.

3        Mr. Campos-Gonzleaz was arrested many times with persons law enforcement say are C

4    Street or 500 Block members; they are also the teenagers he has been friends with since middle

5    school, most of whom he met skateboarding.  Mr. Campos-Gonzales testified he is neither a

6    Norteno nor a member of the C Street gang. He admits others may see it differently, but to him,

7    he is not in a gang, does not do crimes for a gang, and does not follow the rules of the NF.  To

8    Mr. Campos-Gonzalez, C Street is just where he hangs out, and where many of his friends hang

9    out.

10       The jury agreed with most of what the defendant says on this issue, as can be seen from

11   their question regarding whether you be guilty of Count One and the conspiracy if not a member

12   of the enterprise- which is C Street. This question was clearly about Mr. Campos-Gonzalez. The

13   probation officer argues that he committed perjury and obstructed justice when he denied

14   membership in a gang- that is his view.  But this view is not based on evidence, but instead on a

15   preconceived notion and view of the evidence based on his preparation of the PSRs in many of

16   the codefendants cases, and of his meetings with the government attorneys.

17                                    **ARGUMENT**

18       Mr. Campos-Gonzalez stands convicted of one count of RICO conspiracy.  To sentence

19   him within the statutory range of twenty years, this Court must determine the two predicate acts

20   found by the jury, or the relevant conduct to be considered. Though it is unclear what predicate

21   acts the jury found to be true, it is very clear what predicate acts they rejected:  murder,

22   conspiracy to commit murder, attempted murder, robbery, conspiracy to commit robbery and use

23   of guns. There is simply no other way to interpret the jury verdict.

DEFENDANT'S SENTENCING MEMORANDUM - 21

1    Given this verdict and the type and quality of evidence relied upon by the Government,

2    this Court should not attempt to reweigh the findings of the jury under either theory of predicate

3    acts or relevant conduct.  However, if the Court does chose to reevaluate the acquitted counts,

4    the Court should use the standard of proof of either beyond a reasonable doubt or clear and

5    convincing evidence. Under either of these standards of proof- in fact even under the lesser

6    standard of preponderance of the evidence- the Court cannot and should not find the acts alleged

7    in the acquitted counts as proven, and thus should not consider them as sentencing factors or

8    relevant conduct.

9    **1. Predicate Acts for Sentencing on Count One**

10   Under U.S.S.G. § 2E1.1, the base offense level is the greater of the offense level

11   applicable to the underlying racketeering activity or level 19.  The Guidelines further advise that

12   if there was more than one activity underlying a RICO violation, the court should "treat each

13   underlying offense as if contained in a separate count of conviction" to determine which

14   predicate act, or group of acts, would lead to the greater offense level. U.S.S.G. §2E1.1,

15   Comment 1.

16   Mr. Campos-Gonzalez was convicted of Count One, RICO conspiracy.  The jury was not

17   asked to specify which acts formed the basis for this conviction.  In such a situation, the

18   sentencing court must determine the predicate acts in order to calculate the applicable guidelines.

19   There is a split of authority in the Circuit courts as to how this determination should be made,

20   and the Ninth Circuit has not ruled on the issue, leaving the court with two options for how to

21   approach this problem.

22   The first approach, used by the Eleventh Circuit, requires the sentencing court to find the

23   underlying racketeering acts beyond a reasonable doubt.  See, United States v. Farese, 248 F.3d

1056 (11th Cir. 2001)) (holding that the sentencing court must find the underlying predicate offenses for a RICO conspiracy beyond a reasonable doubt); United States v. Nguyen, 255 F.3d 1335, 1341-42 (11th Cir. 2001) (vacating sentence in RICO conspiracy case where court determined unspecified predicate offense under preponderance standard); United States v. McKinley, 995 F.2d 1020, 1026 (11th Cir. 1993) (noting that the commentary to the Guidelines makes clear that when a jury verdict is ambiguous as to the offenses that are the object of the conspiracy, court must use beyond a reasonable doubt standard); United States v. DiGiogio, 193 F.3d 1175, 1177-78 (11th Cir. 1999) (extending the McKinley rule to 1962(d) and 1959(a)(5) prosecutions).

The Eleventh Circuit's rationale is based on Section 1B1.2(d) of the Sentencing Guidelines, which provides that "[a] conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit."  U.S.S.G. §1B1.2(d). Additionally, Comment 4 further states that "[p]articular care must be taken in applying subsection (d) because there are cases in which the verdict or plea does not establish which offense(s) was the object of the conspiracy.  In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiracy to commit that object offense." Id. cmt.n.4.  The Eleventh Circuit has interpreted "were it sitting as a trier of fact" to require that the sentencing court "find beyond a reasonable doubt that the defendant conspired to commit a particular object offense before the court can sentence the defendant on the basis of that offense." Farese, 248 F.3d at 1060-61.

DEFENDANT'S SENTENCING MEMORANDUM - 23

The second option, used by the First and Sixth Circuits, is entirely different.  Instead of treating the RICO conspiracy as a multi-object conspiracy, the courts treat the RICO conspiracy as a single object conspiracy with the object being the violation of RICO.  United States v. Corrado, 227 F.3d 528, 541 (6th Cir. 2000); United States v. Carrozza, 4 F.3d 70, 79 (1st Cir. 1993).  Under this approach, "…the underlying acts of racketeering in a RICO conspiracy are not considered to be the objects of the conspiracy, but simply conduct that is relevant to the central objective– participating in a criminal enterprise." Corrado, 227 F.3d at 542.  As a general rule, the existence of relevant conduct is determined at sentencing by a preponderance of the evidence. Id.  Therefore, this approach involves not only a difference in the burden of proof to be applied by the sentencing court, but also the inquiry to be determined (relevant conduct vs. whether the predicated offense at issue was an object of the RICO conspiracy).

In determining relevant conduct, the sentencing court may, but is not required to, consider acquitted conduct under a lower standard of proof.  United States v. Watts, 519 U.S. 148, 157 (1997); United States v. Mercado, 474 F.3d 654, 662 (9th Cir. 2007).  The Ninth Circuit has held that if the court's reliance on acquitted conduct would have a "disproportionate impact" on a sentence, a defendant's criminal liability for acquitted conduct must be supported by clear and convincing evidence.  United States v. Staten, 466 F.3d 708, 720 (9th Cir. 2006).

**A. Eleventh Circuit Approach**

The racketeering activity charged in this case consisted of:

      i.  Murder

      ii.  Attempted murder

      iii.  Conspiracy to commit murder

      iv.  Robbery

v.   Attempted robbery

vi.   Distribution and possession with intent to distribute controlled substances

vii.   Conspiracy to distribute and to possess with intent to distribute controlled substances

viii.   Witness retaliation and tampering

ix.   Obstruction of justice

In order to find Mr. Campos-Gonzalez guilty of Count One, the jury had to unanimously agree on at least two underlying racketeering activities from this list that Mr. Campos-Gonzalez either directly participated in or knew about and agreed that others would participate in as part of a pattern of racketeering activity.

I.  Murder and Attempted Murder

Although the jury verdict in this case did not specify which underlying acts formed the basis for the conviction on Count One, the jury was specifically asked whether the government had proven "that the defendant agreed and understood that the pattern of racketeering for the racketeering conspiracy charged in Count One would include either murder or conspiracy to commit murder or both."  Special Verdict Form, 1B.  With respect to Mr. Campos-Gonzalez, the jury answered "no" as to both murder and conspiracy to commit murder.  Mr. Campos-Gonzalez was also found not guilty of conspiracy to commit murder in aid of racketeering and conspiracy to commit assault with a dangerous weapon in aid of racketeering in Count Two and Count Three.  Therefore, we know that murder, attempted murder, and conspiracy to commit murder were not the predicate acts for the racketeering conspiracy found by the jury.

//

//

DEFENDANT'S SENTENCING MEMORANDUM - 25

II.  Robbery and Attempted Robbery

Further, in Counts Twenty-Three through Twenty-Seven, the jury acquitted Mr. Campos-Gonzalez of all counts charging him with participation in any robbery.  The government's case theory focused on Mr. Campos-Gonzalez's alleged active participation in these robberies.  As a result, no evidence was presented to suggest let alone prove that Mr. Campos-Gonzalez knew or agreed that others would commit these robberies to benefit the "enterprise."

Essentially, the way the government's evidence was presented, in order to use robbery or attempted robbery as the predicate acts for a conviction on Count One, the jury had to believe that Mr. Campos-Gonzalez was a member of the organization and participated in the robberies with other members of the organization.  There was no evidence presented that would allow any rational trial of fact to conclude that Mr. Campos-Gonzalez had knowledge that others were involved in robberies and attempted robberies, and had joined the organization intending to facilitate those activities, but was not himself participating in them.  The jury verdicts on these counts clearly prove that the jury found that the government had not proved that Mr. Campos-Gonzalez had participated in the robberies and therefore robbery and attempted robbery could not have been racketeering activities that formed the basis of the conviction on Count One.

III.  Witness Retaliation, Witness Tampering, or Obstruction of Justice

The government did not allege that Mr. Campos-Gonzalez was engaged in witness retaliation, witness tampering, or obstruction of justice and no evidence was elicited at trial that Mr. Campos-Gonzalez had knowledge of any other person engaging in either of those activities.

Co-defendant Armando Acosta was convicted of obstruction of justice, however, Mr. Acosta was also much older than Mr. Campos-Gonzalez and the evidence at trial showed that Mr. Campos-Gonzalez had only met Mr. Acosta one or two times and that they were not associates

1   or friends. RT at 7691.  There was no evidence to suggest that Mr. Campos-Gonzalez knew

2   anything about what Mr. Acosta was involved in.  Witness retaliation, witness tampering or

3   obstruction of justice could not have been the racketeering activities upon which Count One was

4   based.

5        It is true that government informant Joseph Jones did testify that when he was in the 500

6   Block gang they did acts of obstruction of justice, including witness tampering. Even if one

7   could argue that the jury found Mr. Jones credible, it is clear that he knew nothing about the

8   activities of C Street and 500 Block in 2009-2011. His involvement in gangs on the street

9   occurred in early 2000s; he was in prison most of the time from 2002-2007 or 2008. Further, in

10  2004 he was put on the prison "No Good List", was green lighted, and was a known snitch. Upon

11  his release from prison in 2005 he went into hiding, according to his own written document

12  prepared for law enforcement in this case, for fear of gang retribution, and thus had little or no

13  contact or knowledge of the activities of street gangs.

14       Similarly, Todd Tonnochy was involved in 500 Block in the early 2000s; he, like Mr.

15  Jones, spent most of his life from 2002 to 2010 in prison for convictions or parole violations;

16  when briefly free on parole, he was paroled to Sacramento, not South San Francisco. Thus, his

17  testimony about gang witness intimidation in early 2000 or before has no relevance to the actions

18  and knowledge of Mr. Campos-Gonzalez.

19       Finally, it was the uncontradicted testimony of Mr. Campos-Gonzalez that he did not

20  know, and had never met, Mr. Jones or Mr. Tonnochy.

21  IV.  Drug Activity

22       The only remaining racketeering activities that could have formed the basis of the verdict

23  on Count One were distribution and possession with intent to distribute controlled substances

DEFENDANT'S SENTENCING MEMORANDUM - 27

1    and conspiracy to distribute and to possess with intent to distribute controlled substances.  Mr.

2    Campos-Gonzalez testified that he sold ecstasy on a small scale, mostly to friends.  RT at 7696.

3    He testified that he was an ecstasy user himself, and when he purchased pills for personal use, he

4    would sometimes purchase extra pills and sell them for a small profit.  *Id.*  Mr. Campos-

5    Gonzalez would make a profit of approximately $2-3 per pill and the most he ever had at one

6    time was 50 pills.  RT at 7697.  Mr. Campos-Gonzalez still contends that there was no evidence

7    produced to show that this drug activity was done in furtherance of the racketeering enterprise,

8    however, the court has already ruled against Mr. Campos-Gonzalez on this issue.

9          If the court employs the Eleventh Circuit's multi-object conspiracy analysis under

10   Section 1B1.2(d), the court must use possession with intent to distribute controlled substances

11   and conspiracy to distribute and to possess with intent to distribute controlled substances as the

12   underlying racketeering activity to calculate Mr. Campos-Gonzalez's guidelines.

13         Under U.S.S.G. § 2D1.1, the offense level for less than 1,000 units of MDMA is 6.  Since

14   U.S.S.G. § 2E1.1 requires a minimum offense level of 19, the court should use offense level 19

15   in calculating the applicable guideline range for Mr. Campos-Gonzalez.

16   **B. Sixth Circuit Approach**

17         Under the circumstances of this case, it would be inappropriate for the court to re-weigh

18   the evidence against Mr. Campos-Gonzalez to determine the predicate acts given the fact that the

19   jury clearly indicated that the only possible acts that could have formed the basis of the

20   conviction were the drug activity.  Although current Ninth Circuit precedent allows the court to

21   consider acquitted conduct as relevant conduct for sentencing, defendant urges the court to tread

22   lightly in a case where doing so would result in such a dramatic increase to his sentence based on

23   conduct that the jury specifically acquitted him of.  As the dissent in United States v. Mercado

DEFENDANT'S SENTENCING MEMORANDUM - 28

1  aptly points out, the Supreme Court has not ruled on whether the Sixth Amendment is violated

2  by reliance on acquitted conduct at sentencing post-<u>Booker</u>.  474 F.3d at 660 (Fletcher, J.

3  dissenting).

4    <u>Booker</u> requires that the jury's verdict alone must authorize a defendant's sentence.

5  <u>United States v. Booker</u>, 543 U.S. 220, 235 (2005).  In <u>Booker</u>, the Supreme Court sought to

6  preserve the substance of the Sixth Amendment by ensuring that a jury would still stand between

7  an individual and the power of the government under the sentencing regime.  <u>Id.</u> at 237.  The

8  Court recognized that the jury could not fulfill this role of insulating defendants from

9  government overreaching unless it was charged with finding all of the facts relevant to

10 sentencing, thereby controlling, within limits, the resulting punishment.  <u>Id.</u> at 235.  Reliance on

11 acquitted conduct in sentencing diminishes the jury's role and dramatically undermines the

12 protections of the Sixth Amendment, in direct contradiction with the precedent in <u>Booker</u>.  As

13 the dissent correctly pointed out in <u>Mercado</u>:

14    By considering acquitted conduct, a judge thwarts the express will of the jury – as
      opposed to the implicit or imputed will of the legislature that is thwarted by a sentence
15    above the statutory maximum – and imposes a punishment based on conduct for which
      the government tried, but failed, to get a conviction.  Such a sentence has little relation to
16    the actual conviction, and is based on an accusation that failed to receive confirmation
      from the defendant's equals and neighbors.  <u>United States v. Mercado</u>, 474 F.3d at 662.

17

18 Though Judge Fletcher's opinion stands as a dissent, the power of her argument and analysis is

19 important and must be considered by this Court before the Court decides to embark on the path

20 that would lead the Court to undo the jury verdict.

21   For now, <u>Mercado</u> allows Courts in this Circuit to consider acquitted conduct under

22 relevant conduct, but does not mandate this Court to do so.   The facts of the present case-

23 discussed in detail above- makes clear why this Court should not conduct such an analysis. The

DEFENDANT'S SENTENCING MEMORANDUM - 29

evidence supporting the murders is based almost entirely on the unreliable hearsay testimony of Magali Flores and Todd Tonnochy, bringing in the further unreliable statements allegedly made by Joey Ortiz to others. This testimony is supported by nothing – no physical or scientific evidence, no corroborating eyewitness testimony.  In fact all such evidence points to the fact that the hearsay evidence of Campos-Gonzalez's involvement in the homicides is false. Clearly the jury found Magali Flores and Todd Tonnochy not credible and totally unreliable.  For similar reasons, the jury rightfully rejected the testimony of Magali Flores regarding Mr. Campos-Gonzales involvement in the two robberies and conspiracy to commit robberies.

Given the type and nature of the government's evidence, this Court should not attempt to reweigh the evidence because there is no basis to do so.  There is no basis on which the Court can make unreliable, uncorroborated hearsay believable; or make incredible witnesses credible; or find such testimony corroborated when there simply is no corroboration; or look at a robbery video that twelve jurors viewed over and over again and said was not Mr. Campos-Gonzalez and say the Court finds it to be Mr. Campos-Gonzalez.  There is no standard of proof the Court could use to say that the contradictory and biased testimony of Magali Flores proves that Mr. Campos-Gonzalez was at the robbery, when there simply is no corroboration.

However, if the court is inclined to use the analysis of the First and Sixth Circuits and determine the underlying racketeering acts by considering acquitted conduct as relevant conduct, the court must find the underlying acts by clear and convincing evidence and not preponderance of the evidence.  If the court were to consider the murder as relevant conduct, it would increase Mr. Campos-Gonzalez' offense level from level 19 to level 43, which would certainly have a disproportionate impact on his sentence.  Therefore, in accordance with the Staten, the court must determine the acts by clear and convincing evidence.  Staten, 466 F.3d at 720.

DEFENDANT'S SENTENCING MEMORANDUM - 30

1    Under U.S.S.G. § 6A1.3, when an important factor to the sentencing determination is

2 reasonably in dispute, the sentencing court may consider "relevant information without regard to

3 its admissibility under the rules of evidence applicable at trial, provided that the information has

4 sufficient indicia of reliability to support its probable accuracy." In this case, almost all of the

5 evidence presented against Mr. Campos-Gonzalez was in the form of multiple layers of hearsay

6 presented through cooperating witnesses. "It is the exclusive function of the jury to determine

7 the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from

8 proven facts." United States v. Rojas, 554 F.2d 938, 943 (9th Cir. 1977).

9    Magali Flores, Michelle Herrera, Todd Tonnochy, Shane Bowman, all testified that they

10 had heard from other sources that Mr. Campos-Gonzalez was involved in the murders, attempted

11 murders and/or robberies that he was charged with committing. Had the jury believed the

12 testimony of these witnesses, Mr. Campos-Gonzalez certainly would have been convicted of

13 each of the various crimes the witnesses alleged he had committed. However, the jury clearly

14 found this testimony to not be credible, as Mr. Campos-Gonzalez was acquitted of every act

15 these witnesses claimed he had participated in. The sentencing court cannot re-weigh the

16 testimony of those witnesses to reach a different conclusion. Based on this determination, the

17 sentencing court cannot consider the witness testimony because it does not have sufficient

18 indicia of reliability to support its probable accuracy as required by U.S.S.G. § 6A1.3. The other

19 evidence, particularly the phone records and cell tower evidence, though credible in that there is

20 actual evidence, do not and cannot prove, even under the preponderance standard, that Mr.

21 Campos-Gonzalez is guilty of any of the acquitted counts of murder. At best this evidence

22 shows interferences of guilt, which are rebutted by equally reasonable inferences of innocence-

23 thus not even proving guilt by a preponderance standard.

## OBJECTIONS TO PROBATION REPORT

The following objections are made to the final probation report:

1. Paragraph 62- This paragraph alleges that Mr. Campos Gonzales is a member of the C Street gang. There is not sufficient evidence to support this allegation. He does not have gang tattoos, throw gang signs, regularly wear red, of ever admit to law enforcement officers, to classification officers in jails or to prison gangs that he is a gang member, nor did he make such admissions at trial. He claimed in jails to be a Northerner for classification issues, and testified at length why he did not consider himself a gang member.

2. Paragraph 63 – The same objection as above; further, defendant objects to the finding that he conspired to commit acts of murder and violence as it is unsupported by the evidence and jury findings.

3. Paragraphs 64-67: These findings not supported by the evidence or jury findings.

4. Paragraph 67:  These findings appear to allege perjury by the defendant. Defendant objects to all and particularly as follows: he may have been mistaken as to when, on parole, he wore the GPS monitoring, and was not sure of the exact dates in his testimony.  Mistakes are not perjury.  Regarding his testimony that he was not C Street gang member- please see previous objection to Paragraph 62, and his stated reasons for not seeing himself as a gang member in his testimony.  Mr. Campos-Gonzalez was NOT involved in the murders; the cell site records do not contradict his testimony, as there was no evidence introduced at trial even raising the inference that there was such a contradiction; the statement that " the records also indicate that Campos Gonzales cell phone utilized a cell tower that was not in the areas that he claimed to be in for his last call prior to the time of the homicides" is not supported by any evidence at trial and

1   assumingly came from the Probation Officer's undocumented meetings with the Prosecutors

2   post-trial.  The assertion that Joey Ortiz stated defendant was the driver of the murder car is

3   contrary to jury findings and is unsupported by any credible evidence.

4           5.  Paragraph 68: These allegations are not based on any credible evidence.

5           6.  Paragraph 70:  This conclusion is based on the Probation Officer's post-trial meeting

6   with the prosecutors and not supported by evidence actually elicited at trial.  The cell tower

7   evidence and fingerprint evidence to not corroborate defendant's guilt.

8           7.  Paragraph 71:  Defendant has not been a member of C Street gang since 2009- this is

9   unsupported by the evidence and contradicted by the jury verdict.

10          8.  Paragraph 73:  The obstruction of justice adjustment is not warranted.  Mr. Campos-

11  Gonzalez has not been charged with perjury, and the jury believed his testimony on all issues

12  raised here.  See further objection to Paragraphs 62-71 above.

13          9.  Paragraph 76:  The relevant conduct and findings pursuant to U.S.S.G. §2E1.1 should

14  be based solely on distribution and possession with intent to distribute a controlled substance

15  and/or conspiracy to distribute and possess with intent to distribute a controlled substance.

16  Under U.S.S.G. § 2D1.1, the offense level for less than 1,000 units of MDMA is 6. Based on Mr.

17  Campos-Gonzalez's testimony that he never had more than 50 pills at any one time, there is no

18  evidence to suggest that he is responsible for more than 1,000 units of MDMA.  An offense level

19  of 19 should be used since that is the minimum offense level required by U.S.S.G. §2E1.1.

20          10.  Paragraph 80: See objections above.

21          11.  Paragraph 94:  Although Mr. Campos-Gonzalez has accumulated 10 criminal history

22  points plus an additional two points for committing the instant offense while under a California

23  State sentence, 6 of those points relate to two felony convictions for vandalism and being an ex-

DEFENDANT'S SENTENCING MEMORANDUM - 33

1   felon in possession of a broken firearm.  These prior convictions do not reflect the criminal

2   history of a defendant who ordinarily would fall within Category V.

3        Criminal History Category V applies to defendants who have accrued 10 or more

4   criminal history points, and is the second most serious classification that a defendant can receive.

5   Category V is thus designed to encompass some of the most serious criminal offenders with

6   lengthy and substantial histories generally involving drug trafficking, severe violence, or

7   firearms.

8        Nonetheless, the Sentencing Commission recognized that the Guidelines might not

9   always account for cases such as this one, and therefore designed § 4A1.3 to address situations

10  where the defendant's history of relatively minor convictions place the defendant in a criminal

11  history category usually reserved for those with substantially more serious criminal histories.  Mr.

12  Campos-Gonzalez respectfully asks that the Court depart below the applicable guideline range

13  pursuant to this Section.  It is well-settled that the sentencing guidelines provide that the

14  sentencing court may depart downward if the applicable criminal history category 'significantly

15  over-represents the seriousness of a defendant's criminal history.'  *U.S. v. Brown,* 985 F.2d 478,

16  481 (9th Cir. 1993).  As the Court of Appeals for the Fourth Circuit has explained:

> 17    Criminal history is, relatively, one of the most flexible concepts in the guidelines. While
> 18    it is possible to classify the severity of current federal offenses with a reasonable degree
>    of precision, mathematically accurate evaluation of the countless possible permutations
> 19    of criminal history, involving offenses of high and petty committed in numerous
>    jurisdictions, would be at best unwieldy. The Sentencing Commission recognized this
> 20    difficulty, and though it prescribed a mathematical method to calculate criminal history, it
>    specifically identified overstatement or understatement of the seriousness of the
>    defendant's past conduct as a ground for departure from the raw criminal history score.

21

22  *United States v. Adkins*, 937 F.2d 947, 952 (4th Cir. 1991); *accord United States v. Summers*,

23  893 F.2d 63, 67 (4th Cir. 1990) (affirming downward departure based on criminal history).

24  DEFENDANT'S SENTENCING MEMORANDUM - 34

1    Accordingly, a departure may be warranted based on a consideration of factors relevant

2  to determine whether the PSR calculation significantly over-represents a defendant's criminal

3  history or the likelihood that the defendant will commit further crimes. *See* § 4A1.3.  In *Summers*,

4  for example, the Fourth Circuit affirmed a downward departure on the ground that the

5  defendant's criminal history category overstated the severity of the defendant's criminal history,

6  which included "convictions for grand larcenies, possession of narcotics, a weapons violation,

7  driving with suspended license violations and probation revocation." 893 F.2d at 65.

8    Mr. Campos-Gonzalez's lengthy but relatively small-time criminal history is simply not

9  in the same league as the violent offenders, drug kingpins and perpetrators of far more serious

10  offenses that Criminal History Category V was designed to address.  Since Mr. Campos-

11  Gonzalez is right on the border between category IV and category V, the difference in categories

12  is really a single non-violent felony charge.

13    In sum, a mechanical application of the Guidelines in this case significantly exaggerates

14  the significance of Mr. Campos-Gonzalez's criminal history. For these reasons, Mr. Campos-

15  Gonzalez respectfully requests the Court to grant his request for a downward departure in this

16  case to criminal history category IV, a level that more accurately reflects the seriousness of his

17  criminal history.

18    Finally, counsel does not see any reason to continue the debate with the Probation Officer

19  as to why he relied on meetings and conversations with Government counsel and whether

20  defense counsel failed to timely provide evidence to the Probation Officer. See footnote 1. Also

21  such a debate does not aid the Court in determining the issues before the Court. However, as to

22  the response to Objection 4, counsel would point out that defendant did offer much more than a

23  denial- he offered, and provided to the Officer, his complete testimony at trial.

DEFENDANT'S SENTENCING MEMORANDUM - 35

**CONCLUSION**

Counsel regrets the need for such a lengthy and detailed sentencing memo, however, given the issues raised in the Probation Report, counsel believed that the factual discussions herein are necessary.

Counsel believes and argues that defendant should be sentenced in accordance with the jury verdicts: on Count One, with a finding of the predicate acts, or relevant conduct, as controlled substance distribution and possession with intent to distribute a controlled substance and/or conspiracy to distribute or possess with intent to distribute a controlled substance, in accordance with his testimony.  Assuming his Criminal History remains at V, with an offense level of 19, this results in a sentence between 57 and 71 months.  With a Criminal History IV and an offense level of 19, this results in a sentence between 46 and 57 months.

The jury has determined the crimes that Mr. Campos Gonzales was guilty of, and what crimes he was not guilty of.  For all the reasons stated herein, this Court should not overturn these verdicts. The jury sacrificed over three months of their lives immersing themselves in this case and reaching a fair and just verdict.  They did justice.  Counsel knows that this Court respects the jury, its work and dedication, and its verdict.  Counsel is confident that this Court will sentence fairly, and in accordance with the will and decision of the jury.


Dated:  April 24, 2015                                     Respectfully Submitted,

                                                                              /s/

                                                          _____
                                                          STUART HANLON
                                                          Attorney for Defendant
                                                          BENJAMIN CAMPOS-GONZALEZ

DEFENDANT'S SENTENCING MEMORANDUM - 36